1  JEAN MURRELL ADAMS, Bar No. CA 138458
   LAURETTE M. GARCIA, Bar No. CA 242107
2  ADAMS ESQ, a Professional Corp.
   449 Fifteenth Street, Suite 101
3  Oakland, California 94612
   Telephone:  (510) 832-6000
4  Facsimile:  (510) 832-3099

5  Attorneys for Plaintiff, KEISHA HAWKINS and
   Counter-Defendant, JEAN MURRELL ADAMS &
6  ADAMS ESQ, A PROFESSIONAL CORPORATION

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11
   KEISHA HAWKINS,                    │  Case No.: Case No.: C07-CV-04206-EMC
12                                     │
                    Plaintiff,         │  **COUNTER-DEFENDANT'S NOTICE**
13                                     │  **OF MOTION AND MOTION TO**
   v.                                  │  **DISMISS COUNTER-COMPLAINT**
14                                     │  **WITH PREJUDICE, OR FOR A MORE**
   BERKELEY UNIFIED SCHOOL DISTRICT,   │  **DEFINITE STATEMENT;**
15 and  DOES 1-20                      │  **MEMORANDUM OF POINTS AND**
                                       │  **AUTHORITIES IN SUPPORT**
16                  Defendants.        │  **THEREOF**
                                       │
17 ──────────────────────────────────  │
                                       │  DATE:         January 16, 2008
18                                     │  TIME:         10:30 AM
   BERKELEY UNIFIED SCHOOL DISTRICT,   │  LOCATION:     Courtroom C, 15th Fl.
19 and  DOES 1-20,                     │  JUDGE:        Hon. Edward M. Chen
                                       │
20                  Counter-Claimant,  │
                                       │  Complaint Filed:        8/ 16/07
21 v.                                  │  Counter-Complaint Filed: 9/17/07
                                       │
22 ADAMS ESQ, A PROFESSIONAL           │
   CORPORATION AND JEAN MURRELL        │
23 ADAMS                               │
                                       │
24                  Counter-Defendants.│

25

26 ///

27 ///

28 ///

ADAMS ESQ
A Professional Corporation
449 Fifteenth Street
Suite 101
Oakland, CA 94612
510/832-6000

1    TO ALL PARTIES AND TO THER RESPECTIVE ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE that on January 17, 2008 at 10:30 AM, or as soon thereafter as

3  the matter may be heard in Courtroom C of the above-entitled Court, located at 450 Golden Gate

4  Street, San Francisco, California, Counter-Defendants ADAMS ESQ, A Professional Corporation

5  ("Adams Esq") and Jean Murrell Adams ("JMA") will and hereby does move this Court for an

6  order dismissing with prejudice Counter-Claimant Berkeley Unified School District's claim for

7  relief against Counter-Defendants JMA and Adams Esq on the grounds the Counter-Complaint

8  fails to state a claim under Fed. R. Civ. P. 12(b)(6); or alternatively, for a more definite statement

9  under Fed. R. Civ. P. 12(e); and dismissal of the Counter-Complaint. As to Counter-Defendants

10 JMA and Adams Esq on grounds that they are not proper parties under Fed. R. Civ. P. 13 and 14.

11 Should the Court allow JMA to remain as a party in her individual capacity as a Counter-

12 Defendant, then the Moving Parties request dismissal of the Counter-Complaint for failure to state

13 a claim.

14    This motion is based upon this Notice of Motion, the attached Memorandum of Points and

15 Authorities, the Declaration of Jean Murrell Adams, the evidence presented herewith, the pleadings

16 and papers on file herein and such further documentary or oral evidence as my be presented at the

17 hearing.

18

19

20 Dated: November 21, 2007                          Respectfully submitted,

21                                                   ADAMS ESQ

22

23    _____

24                                                   JEAN MURRELL ADAMS
                                                     Attorneys for Plaintiff, Keisha Hawkins
25                                                   and Counter-Defendant, Adams ESQ,
                                                     A Professional Corporation and
26                                                   Jean Murrell Adams

27

28

ADAMS ESQ
A Professional Corporation
450 Golden Gate
San Francisco, CA 94118
(415)673-6400          MOTION TO DISMISS                -1-                BUSD V. ADAMS ESQ & JMA
C07-CV-04206-EMC

# I. INTRODUCTION

### A. Motion to Dismiss

Counter-Defendants ADAMS ESQ, A Professional Corporation ("Adams Esq") and Jean Murrell Adams ("JMA") seek the following relief:

1. Dismissal of the Counter-Claim as to purported Counter-Defendants JMA and Adams Esq on the grounds that they are not proper parties under Fed. R. Civ. P. 13 or 14, because neither of these moving parties is "an opposing party" within the meaning of Rule 13, and neither has been timely named in a third party complaint under Rule 14;

2. Dismissal of the Complaint as to Counter-Defendants Adams Esq and JMA, for failure to state a claim under, Fed. R. Civ. P. 12(b)(6) because as to each of these moving parties insufficient facts are alleged under any of the legal theories asserted;

3. Alternatively, for a more definite statement under Fed. R. Civ. P. 12(e);

### B. Factual Background

1. Plaintiff Keisha Hawkins ("Hawkins") is the mother of a minor child ("D.S." or "Student"), a student eligible for special education.

2. On October 5, 2006, Hawkins requested all of Student's records from the Berkeley Unified School District ("District"). Rather than produce all records as Hawkins had requested, the District queried Hawkins as to the purpose of her request and then provided limited documents that *the District* believed Hawkins needed.

3. On October 20, 2006, Adams Esq requested records from the District. Again, the District failed to produce all of Student's records.

4. On or about November 1, 2006, Hawkins requested a due process hearing (the "Initial Complaint") before the Office of Administrative Hearings ("OAH") alleging that the

ADAMS ESQ
ATTORNEYS & COUNSELORS
440 Harrison Street
Suite 400
Oakland, CA 94612
510.452.7003

MOTION TO DISMISS                    -2-                    BUSD V. ADAMS ESQ & JMA
C07-CV-04206-EMC

1  Defendant denied the minor D.S. a Free Appropriate Public Education ("FAPE") as required by
2  federal and state law.

3       5.    A hearing was held on April 2-5 & 10 2007. On the third day of hearing, the
4  District conceded with respect to portions of the Initial Complaint. On May 18, 2007, OAH
5  Administrative Law Judge Thawley ("ALJ") issued a decision (the "Decision"). D.S. prevailed
6  with respect to portions of Claims 1 and 3 of the Initial Complaint. A true and correct copy of the
7  Decision is attached hereto as Exhibit "A".

8       6.    Hawkins is now appealing Claims 2, 4 and 5 and a portion of the remaining
9  claims that Student lost. By way of counter-claim, the District is now seeking its attorneys' fees
10  from D.S.'s and Parent's attorneys. The attorneys, Adams Esq and JMA were not parties to the
11  original action.

12      **C.**    **Procedural Background**

13      Hawkins brought this proceeding for a review of a portion of the Decision under 20 U.S.C.
14  § 1415(i). She is seeking to reverse the Administrative Law Judge's incorrect finding that (i) the
15  District had no obligation to provide Hawkins with prior written notice when it moved Student
16  from a special day class to a general education classroom with Resource; (ii) the District's
17  placement was reasonably calculated to provide some educational benefit, and was designed to
18  meet Student's unique needs in the areas of reading comprehension and math problem solving, due
19  to a significant language impairment or auditory processing disorder, both expressive and
20  receptive, as well as attention issues and was therefore appropriate except for the lack of speech
21  and language therapy; (iii) the District's production of Student's records to Hawkins or Hawkins's
22  attorney, or the lack thereof, was not a meaningful procedural violation because it did not in any
23  way affect Student's placement or Hawkins's opportunity to participate in the decision-making
24  process; (iv) the District was the prevailing party with respect to issue 5 regarding prior written
25  notice, while at the same time acknowledging that the District failed to hold Student's annual
26  individual education program ("IEP") meeting on or before September 29, 2006 and failed to
27  provide speech and language therapy during the first 11 weeks of the 2006/2007 school year; and
28  (v) with respect to compensatory education, that District only owed D.S. only 22 hours of direct

ADAMS ESQ
A Professional Corporation
449 Fifteenth Street
Suite 200
Oakland, CA 94612
510.452.9900

MOTION TO DISMISS           -3-           BUSD V. ADAMS ESQ & JMA
C07-CV-04206-EMC

1 | speech and language therapy.

2 |     The District filed its Counter-Complaint on September 17, 2007. The District asserts its

3 | Counter-Claim against two new parties, Adams Esq and JMA as Counter-Defendants. The

4 | Counter-Claim purports to allege claims under the IDEA 20 U.S.C. 1415(i)(3)(B)(i)(II), 20

5 | U.S.C.(i)(B)(i)(III), 34 C.F.R. 300.507 (a)(1)(ii) and 34 C.F.R. 300.507(a)(1)(iii). These "new

6 | parties" were improperly named because they were not parties to the Complaint, i.e., they were not

7 | "opposing parties." (Fed. R. Civ. P. 13).

8 |     The instant Motion is based upon grounds that the Counter-Complaint is deficient because

9 | Adams ESQ and JMA are not proper Counter-Defendants, nor does the Counter-Complaint state

10 | claims upon which relief may be granted. Counter-Defendants request that the Counter-Complaint

11 | be dismissed without leave to amend.

12 | **II. ARGUMENT**

13 |     For the reasons set forth below, the Counter-Complaint is fatally defective and, accordingly

14 | the Court should dismiss it.

15 |     **A.    Jean Murrell Adams is Not a Proper Counter-Defendant**

16 |     JMA is not a Plaintiff or a Defendant in the Complaint. A new party may not be brought

17 | into a pending action via a counterclaim. (Fed. R. Civ. P. 13.) Moreover, there has been no

18 | compliance with the proper procedure for adding new parties through a third-party complaint. (Fed.

19 | R. Civ. P. 14(a). Accordingly, JMA's name must be stricken as a party.

20 |     Additional grounds for dismissing JMA from this case appear on the face of the Counter-

21 | Complaint. Except for vague references to "Mother's attorney," the only direct reference to JMA

22 | is in paragraph 8 where the Administrative Law Judge informed counsel JMA that he was

23 | concerned about the District's claim of false allegations. Without any factual context for her

24 | connection with this case, JMA has been gratuitously included in her individual capacity, by stating

25 | her name only, along with Adams Esq, in the Counter-Claim.

26 |     If JMA is not stricken from this proceeding as an improperly named Counter-Defendant,

27 | she should be dismissed under Rule 12(b)(6) because there is no claim stated against her. There

28 | are no facts alleged to demonstrate her involvement in the dispute in her personal capacity. As

ADAMS ESQ
A Professional Corporation
465 California Street
Suite 411
San Francisco 94104
415.912.3900

MOTION TO DISMISS    -4-    BUSD V. ADAMS ESQ & JMA
C07-CV-04206-EMC

1  such the Counter-Complaint should be dismissed as to JMA. Alternatively, the District should be

2  ordered to provide a more definite statement of claims so that she can respond appropriately.

3  The facts allege nothing substantive about JMA. There simply are no facts alleged in the Counter-

4  Claim as to claim stated against her, much less against her in her "individual capacity."

5        **B.      Adams Esq is Not a Proper Counter-Defendant**

6        The Counter-Claim alleges that Adams Esq, attorneys for Plaintiff Keisha Hawkins is liable

7  for the District's attorneys' fees. As explained in section II.A. above, Adams Esq like JMA is not a

8  proper Counter-Defendant under Rule 13(a) as it was neither a plaintiff nor defendant in this

9  action. On this basis alone, the Counter-Complaint must be dismissed as to Adams Esq. In

10  addition, there has been no compliance with the proper procedure for adding new parties through a

11  third-party complaint. (Fed. R. Civ. P. 14(a).) Accordingly, Adams Esq must be stricken as a

12  Counter-Defendant.

13       **C.      The District's Counter-Claim Fails to State a Claim**

14       The District bases its Counter-Claim on Section 1415(i)(3)(B)(i)(II)&(III). Pursuant to that

15  provision, a prevailing school district can seek their attorneys' fees from the parent's attorney only

16  if the due process action or subsequent court case is "frivolous, unreasonable, or without

17  foundation," or the parent's attorney continues to litigate after it clearly became frivolous.

18
19  According to the Congressional Record, this provision is based upon *Christiansburg Garment Co.*

20  *v. EEOC*, 434 U.S. 412 (1978). 150 Cong. Rec. S11655, H10011, H10021 (November 19, 2004).

21  Under *Christiansburg*, courts shift fees to plaintiffs only in the most exceptional cases. Fees may

22  shift if the parent's case is frivolous with absolutely no chance of success -- but not if it is merely

23  very weak with little chance of success. *See Khan v. Gallitano*, 180 F.3d 829 (7th Cir.

24  1999); *Bonner v. Mobile Energy Services Co.*, 246 F.3d 1303, 1305 (11th Cir. 2001). Under

25
26  *Christiansburg*, frivolousness is generally found only if plaintiffs fail to produce evidence in

27  support of an essential element of a prima facie case, or lack any legal authority to support the

28  case, or because the facts that the plaintiff alleged, even if true, can never be a violation of the

ADAMS ESQ
A Professional Corporation
4423 anos of Avenue
Suite 400
Oakland, CA 94611
510.923.8291

MOTION TO DISMISS                           -5-                    BUSD V. ADAMS ESQ & JMA
                                                                  C07-CV-04206-EMC

1  law. *See, e.g., Bass v. E.I. Dupont*, 324 F.2d 761 (4th Cir. 2003); *AFSCME v. County of Nassau*,

2  96 F.3d 644 (2d. Cir. 1996); *Ryan v. City of Carlsbad*, 58 F.3d 439 (9th Cir. 1995).

3         Here, Plaintiff was successful in portions of the underlying Initial Complaint. The District

4  has stated its claim in vague and conclusory terms and has failed to set forth facts to show that the

5

6  Initial Complaint was frivolous and without any chance of success. In fact, the District's Counter-

7  Complaint admits that the Complaint was not wholly without merit. In paragraph 9, the District

8  pleads, "…Judge Thawley further found that [ ] Student partially prevailed on Claims 1 and 3."

9  Moreover, the District also admitted that it conceded portions of Claims 1 and 3 alleged in

10 Student's Complaint; hence, the District cannot at the same time allege that Student's Complaint

11 was without foundation. The Ninth Circuit, has held that a nonfrivolous complaint cannot have an

12

13 improper purpose, because society benefits from the filing of serious complaints. *Townsend v.*

14 *Holman Consulting Corp.*, 929 F.2d 1358 (9th Cir. 1991) (en banc).

15        The District offers the Administrative Law Judge's decision that it was the prevailing party

16 on Claims 2, 4, and 5 and portions of Claims 1 and 3 of Student's Complaint as basis for its

17

18 Counter-Complaint. These are the very issues on which the Plaintiff is appealing. In light of the

19 Plaintiff's appeal of this portion of the Decision, there is no final order. Finally, the District's

20 Counter-Complaint does not include the amount of attorneys' fees that it is seeking form the

21 Counter-Defendants. Thus, Counter-Defendants have not been put on notice as to their possible

22 liability.

23        Therefore, the District's Counter-Claim fails to state a claim under the IDEA and must be

24 dismissed. As such, dismissal without leave to amend is proper.

25

26

27

28

MOTION TO DISMISS                    -6-                    BUSD V. ADAMS ESQ & JMA
                                                           C07-CV-04206-EMC

1

## III. CONCLUSION

2        For the foregoing reasons, Plaintiff Hawkins and purported Counter-Defendants, ADAMS

3    ESQ, A PROFESSIONAL CORPORATION and JEAN MURRELL ADAMS, request that the

4    Counter-Complaint be dismissed as requested above.

5

6

7    Dated:  November 21, 2007                          Respectfully submitted,

8                                                        ADAMS ESQ

9

10                                                       _____
                                                         JEAN MURRELL ADAMS
11                                                       Attorneys for Plaintiff, Keisha Hawkins
                                                         and Counter-Defendant, Adams ESQ,
12                                                       A Professional Corporation and
                                                         Jean Murrell Adams
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT    "A"

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matter of:

STUDENT,

          Petitioner,

v.

BERKELEY UNIFIED SCHOOL DISTRICT,

          Respondent.

OAH CASE NO. N2006110033

## DECISION

John A. Thawley, Administrative Law Judge (ALJ), Office of Administrative Hearings, Special Education Division (OAH), State of California, heard this matter on April 2 through 4 and 10, 2007, in Oakland, California.

Jean Adams and Laurette Garcia, Attorneys at Law, represented Petitioner (Student). Student's Mother attended the hearing.

Peter Sturges and Diane Rolen, Attorneys at Law, represented Respondent Berkeley Unified School District (District). Elaine Eger, District Special Education Manager, attended the hearing.

Student's due process hearing request was filed on November 1, 2006. A continuance was granted on December 22, 2006. Oral and documentary evidence were received. The record was held open for the submission of closing briefs by April 30, 2007. The briefs were timely filed, the record closed, and the matter was submitted on April 30, 2007.

**EXHIBIT "A"**

## ISSUES[1]

1.  Did the District deny Student a free, appropriate public education (FAPE) by not conducting an annual individualized education plan (IEP) team meeting for Student from September 29, 2006, to the present?

2.  Did the District deny Student a FAPE from August 31, 2006, through the present by moving him from a special day class (SDC) to a general education (GE) classroom without Mother's consent?

3.  Did the District deny Student a FAPE from August 31, 2006, through the present by failing to provide him with a placement and services designed to meet his unique needs and reasonably calculated to provide some educational benefit in conformity with the IEP?

4.  Did the District deny Student a FAPE by not timely producing his educational records to Mother, and by not producing his complete educational records?

5.  Did the District procedurally deny Student a FAPE by failing to provide Mother with prior written notice regarding the change of Student's placement from a SDC to a GE classroom, failing to hold Student's annual IEP team meeting, and failing to design an educational placement to meet Student's unique educational needs?

## PARTIES' CONTENTIONS

Student contends that: (1) the District did not hold an annual IEP when it was due, on September 29, 2006; (2) the District did not provide written notice to Mother of the IEP team meeting scheduled for November 13, 2006; (3) the District unilaterally cancelled the IEP team meeting of November 13, 2006, and bears responsibility for failing to re-schedule the meeting; (4) the District should have held an IEP team meeting and obtained Mother's consent before moving Student from a SDC to a GE classroom during Student's first week of the 2006-2007 school year (SY) at King Middle School (KMS); (5) the District failed to provide speech and language therapy (SLT) to Student from the start of the 2006-2007 SY, on August 31, 2006, until February 2, 2007 (the day after the mediation); (6) District improperly asked Mother the purpose for her first request for a copy of Student's educational records, and then improperly provided only those records that the District thought were required; and (7) District's response to Mother's requests for Student's educational records was incomplete, to the point that District produced one document for the first time during the hearing. Student seeks, among other things, independent assessments, 300 hours of compensatory education, and an IEP team meeting within 60 days of the hearing.

---

[1] The ALJ has clarified the issue statements according to the evidence presented at the due process hearing.

District concedes that Student's annual IEP was late, because it was due on September 29, 2006, but was not scheduled until November 13, 2006. District also concedes that it failed to provide Student with SLT from the start of the 2006-2007 SY. However, as to the remainder of Student's claims, District argues that: (1) the IEP team meeting scheduled for November 13, 2006, was cancelled because Mother refused to attend; (2) Mother never re-scheduled the IEP team meeting, even though District attempted to contact Mother to re-schedule the meeting; (3) Mother told District personnel that she could not talk to them and that they would have to talk with her attorney; and (4) Mother's attorney refused to hold the IEP team meeting until the resolution session or mediation occurred. District argues that the cut-off date for its failure to provide SLT should be November 13, 2006, because, had the IEP team meeting been held, District would have recommended and provided SLT following that meeting. District also asserts that the movement of Student from an SDC to a GE classroom during the first week of his first year in middle school was simply the prompt correction of a clerical error, to ensure compliance with the most recent and consented-to IEP dated September 29, 2005, and was not a change in placement that required an IEP and Mother's consent. The District argues that Mother verbally indicated that the purpose for her first written request for records was to assist with a church tutoring program, which led to District confusion as to what records Mother was seeking, but that the District provided all of the records. The District asserts that any delay in providing Student's records did not deny Student an educational benefit or prevent Mother from meaningfully participating in the IEP process. The District argues that prior written notice was not required to correct the clerical error that resulted in Student mistakenly being placed in a SDC at the start of the 2006-2007 SY. The District also argues that prior written notice was not required for the failure to hold an IEP team meeting, because the District was ready to conduct an IEP team meeting as of November 13, 2006, tried to re-schedule the IEP team meeting, and remains ready to the present day to hold the IEP team meeting.

## FACTUAL FINDINGS

1.      Student was born December 26, 1993, and lives within the District's boundaries. He was initially found eligible for special education and related services during the 2003-2004 SY due to speech and language difficulties. For the 2003-2004 SY, Student was placed in a SDC for the Communicatively Handicapped (CH). The SDC CH was taught by Cheryl Marsh, a credentialed SE teacher and speech and language therapist, who included SLT in the context of the core curriculum. Over the course of the next two SYs, the time that Student spent in a GE classroom increased, and the SDC CH evolved into a Learning Center that supported both SE and GE pupils. Pursuant to a mediation agreement between the parties, Student was moved to a SDC at King Middle School (KMS) on February 2, 2007.

*The annual IEP team meeting that was due on September 29, 2006*

2.      A school district must conduct reassessments of a pupil receiving special education and related services, and hold IEP team meetings, after the initial assessment that established eligibility. The reassessments and IEP team meetings need not occur more

3

frequently than once a year, but must be done no less than every three years (frequently called "triennial" assessments and IEP).

3.      Student's annual IEP was due on September 29, 2006. Mother signed the triennial assessment plan on about September 11, 2006. The District concedes that, as of September 29, 2006, it had not completed the triennial assessment, and therefore was not ready to conduct the annual IEP to review the triennial assessment results.

4.      Susan Ryan, Student's resource teacher at KMS, was responsible for organizing and scheduling IEP team meetings. Ms. Ryan called Mother on November 2, 2006, regarding Student's IEP team meeting. On November 6, 2006, Ms. Ryan prepared the IEP team meeting notices for Mother and the appropriate District personnel, indicating that Student's IEP team meeting was scheduled for November 13, 2006. Ms. Ryan also prepared a draft IEP.

5.      At some point during the week that Ms. Ryan was working on Student's draft IEP and preparing for the IEP team meeting, Ms. Ryan called Mother. During one of Ms. Ryan's phone calls to Mother, Mother told Ms. Ryan that she would not be able to attend the IEP team meeting on November 13, 2006, because her daughter had an IEP team meeting at her school. Mother told Ms. Ryan that she would call back to re-schedule Student's IEP team meeting. Mother never did so.

6.      During another phone call from Ms. Ryan to Mother, Mother declined to speak with Ms. Ryan, and told Ms. Ryan that she would have to talk to Mother's attorney. Ms. Ryan called Mother's attorney, who told her that the IEP team meeting would have to be put on hold until the mediation in this matter had occurred. Ms. Ryan suggested that it would make sense to hold the IEP team meeting because the results of the assessments of Student were available, and because the IEP team could discuss or answer any questions about Student's placement. Mother's attorney told Ms. Ryan that those issues were different than the substance of the mediation, and would be dealt with when the IEP team met. On November 9, 2006, Ms. Ryan made a calendar note that Student's IEP team meeting had been postponed.

7.      Amy Rosenbaum, Ph.D., the District school psychologist, conducted the triennial psycho-educational assessment of Student in about late October or early November 2006. As part of the assessment, Dr. Rosenbaum called Mother. Dr. Rosenbaum told Mother that she was calling, as part of the triennial assessment, to hear Mother's thoughts about Student, how he was doing in school, and any concerns Mother might have. Mother told Dr. Rosenbaum that she could not talk to her, and that Dr. Rosenbaum would have to call Mother's attorney. However, Mother did not provide her attorney's name or phone number. Dr. Rosenbaum did not contact Mother again. Dr. Rosenbaum talked with her supervisor, Doctor Donald Klose, and Ms. Ryan, and was told that the IEP was "on hold."

8.      Dr. Klose sent a letter to Mother on January 23, 2007, to attempt to re-schedule the IEP team meeting for February 9, 2007. District received no response. Mother

4

admitted that the letter was sent to her correct address, but testified that she did not receive the letter. However, as discussed further in Factual Finding 31, Mother's testimony in this regard is not credible. Mother admitted that she had a poor memory, and that she "could have" received the letter, because she receives "so much" mail from the District.

9.    The District was ready to conduct Student's IEP team meeting no later than Monday, November 13, 2006, which is about six weeks after the IEP team meeting was due. However, Mother unreasonably refused to attend an IEP team meeting, and Mother's attorney unreasonably insisted that any IEP team meeting must be held after mediation. As a result, District is excused from not holding an IEP team meeting after November 13, 2006. Accordingly, the District is not responsible for any more than six weeks of delay in the holding of an IEP team meeting.

10.    Procedural violations constitute a denial of FAPE only if the violations impeded a pupil's right to a FAPE, caused a deprivation of educational benefits, or significantly impeded the parents' right to participate in the decision-making process regarding the provision of a FAPE to the parents' child. The failure to hold an IEP team meeting for six weeks did not significantly impede Mother's right to participate in the IEP process, in light of the fact that Mother indicated that she could not attend the IEP team meeting, unreasonably refused to communicate with Ms. Ryan and Dr. Rosenbaum, unreasonably failed to respond to the District's attempt to re-schedule the meeting, and unreasonably did not attempt to re-schedule the meeting.

11.    As to whether the procedural violation of failing to hold the IEP team meeting impeded the Student's right to a FAPE, or caused a deprivation of educational benefits, Factual Findings 18 through 28 establish that Student's educational program at KMS was appropriate, with the exception of the District's failure to provide SLT. As noted in Factual Findings 25 through 28, District violated Student's right to a FAPE by failing to provide SLT from August 31, 2006, to November 13, 2006. Therefore, any loss of educational opportunity to Student, which would entitle Student to compensatory education for the District's procedural violation of failing to hold an IEP team meeting, will be awarded to Student for the District's demonstrated and conceded failure to provide SLT.

12.    Student asserts that the District committed a procedural violation of his right to a FAPE by not providing Mother with written notice of the IEP team meeting scheduled for November 13, 2006. Ms. Ryan prepared a notice of the IEP team meeting but was not certain that she sent it to Mother. However, even assuming that the District failed to provide written notice of the IEP team meeting, Student has not demonstrated the denial of a FAPE, the deprivation of an educational opportunity, or a significant impediment on Mother's opportunity to participate in the decision-making process, for the reasons discussed in Factual Findings 10 and 11. Accordingly, any violation was not material and did not constitute a procedural denial of a FAPE.

5

*The District's Movement of Student from a SDC to a GE classroom*

13.    School districts must provide each pupil who is found eligible for special education and related services with an appropriate placement, which is defined as the unique combination of facilities, personnel, location or equipment necessary to provide instructional services to the pupil, as specified and detailed in the pupil's IEP. Any change of placement for a special education pupil must be accomplished via the IEP team meeting process, with the consent of the pupil's parent or guardian.

14.    Student's IEP of September 29, 2005, was in effect on Student's first day at KMS at the start of the 2006-2007 SY. The IEP called for Student to be educated in a GE classroom for up to 70 percent of his school day, and to receive SDC support, in the Learning Center Support model, for at least 45 minutes per school day, and up to 90 minutes per school day. The IEP indicated that 39 percent of Student's school day would be spent in special education.

15.    On the first day of the 2006-2007 SY at KMS, Student was on Ms. Ryan's caseload, but she did not find him in the GE classroom where she expected to see him. Instead, she saw him in a SDC. However, there were often placement mistakes at the start of the school year for sixth grade pupils who were entering middle school.

16.    Dr. Klose was also surprised to see Student in the SDC. Dr. Klose pointed out that, per Student's most recent IEP, Student was not supposed to be in the SDC, and it would constitute a change of placement if he were allowed to stay in the SDC. By the second week of school, Student was moved into a GE classroom with Resource support from Ms. Ryan.

17.    District's placement of Student in a KMS SDC, at the start of the 2006-2007 SY, was not consistent with the IEP in effect at the time, dated September 29, 2005. As a result, District was required to move Student from the SDC to a GE classroom to comport with the IEP and to correct the District's error. Accordingly, the movement was not a change in placement, and District was not required to hold an IEP and/or to obtain parental consent before correcting the initial, erroneous SDC placement.

*Student's Unique Academic Needs as of the Start of the 2006-2007 SY*

18.    A school district must offer a FAPE that is designed to meet a pupil's unique needs, is reasonably calculated to provide some educational benefit, and is in conformity with the pupil's IEP.

19.    The parties do not dispute that: (1) Student's strengths include encoding and decoding words; (2) Student requires SLT; and (3) Student has unique needs in the areas of reading comprehension and math problem solving, due to a significant language impairment or auditory processing disorder, both expressive and receptive, as well as attention issues (focus, organization, and distractability).

20.     Student's IEP of September 29, 2005, contained eight goals in the areas of social/emotional skills, language, reading comprehension, writing, and math. Ms. Marsh, Student's SDC teacher during the 2005-2006 SY, established that Student received an average of 90 minutes per day of special education support from the SDC Learning Center. Student's Learning Center support was provided both in his GE classroom ("push-in") and in other locations outside the classroom, such as the Learning Center ("pull-out").

21.     Student's placement (educational program) in a KMS GE classroom with Resource support was the equivalent of Student's placement for the 2005-2006 SY, in light of the fact that KMS did not have a SDC Learning Center. When Ms. Ryan assessed Student in September 2006, she found that he had a range of skills, which were within the range of skills she worked on with other pupils who received Resource support. Ms. Ryan or her assistant supported Student with both push-in and pull-out Resource services, on a one-to-one basis and in small groups. The support occurred in Student's morning English-History class, and in Student's afternoon Math-Science combination class. Ms. Ryan spent substantial time with Student because, among her caseload of six pupils, she believed he was one of her highest-need pupils. Ms. Ryan was in Student's class for approximately 45 to 90 minutes per day. Ms. Ryan provided credible testimony regarding the support she provided for Student, in light of her experience, which consisted of over 30 years of teaching, 22 years of which was providing Resource support at the middle school level, as well as her education, which includes many continuing education classes, a master's degree in Resource support, and a thesis on working with pupils with language disorders.

22.     Student presented expert testimony that, among other things, Resource support on a push-in basis was not appropriate for Student, and that a SDC with mainstreaming options was the appropriate placement for him. However, the testimony is not entitled to great weight, because: (1) the expert spent little time with Student only the week before the hearing; (2) the expert was not fully aware of all of the assessments District had conducted on Student; (3) the expert did not observe Student at KMS; (4) the expert did not interview any of Student's teachers at KMS; (5) the expert did not know how much time Student spent receiving Resource support, or what methods or materials Ms. Ryan used when providing support to Student, or what accommodations and/or modifications Student was receiving at KMS; and (6) the expert had no knowledge of the KMS SDC. Moreover, the expert's testimony was occasionally contradictory. For example, the expert recommended a SDC for Student, and testified that Student needed good language models, such as typically developing peers; however, the expert also expressed concern about exposing Student to SDC pupils with moderate to severe behavioral problems.

23.     Student points to his mediocre grades as evidence that his KMS GE classroom placement was inappropriate. However, other factors impacted Student's grades. For example, Student only participated in two or three sessions of the KMS Homework Club. When Ms. Ryan called Mother, she was told that Student could attend, so Ms. Ryan did not know why he did not attend. Also, Student is supposed to wear glasses. However, he does not do so at school. During a psycho-educational assessment in September 2003, Student

told an assessor that he does not bring his glasses to school because he believes they cause people to laugh at him.

24.    Student's placement in the GE classroom with Resource support at KMS comported with the last consented-to IEP, dated September 29, 2005. As determined in Factual Findings 18 through 24, the placement was designed to meet Student's unique needs and was reasonably calculated to provide some educational benefit, in conformity with the last IEP for which Mother had provided her consent, except for Student's need for SLT, as noted in Factual Findings 25 through 28. In addition, Student received approximately as much Resource support from Ms. Ryan, on an average daily basis, as he did from Ms. Marsh during the previous school year, without considering the lack of SLT during the 2006-2007 SY, as discussed in Factual Findings 25 through 28. Therefore, except for the lack of SLT, Student's KMS placement (educational program) was appropriate.

*Student's Unique Speech-Language Needs as of the Start of the 2006-2007 SY*

25.    During the 2005-2006 SY, Ms. Marsh, Student's SDC teacher who was also a credentialed speech and language therapist, included SLT in the context of the core curriculum of the Learning Center.

26.    Jean Zika is a licensed speech and language therapist who works for East Bay Therapy, which contracts with the District. Early in the 2006-2007 SY, Ms. Ryan talked to Ms. Zika about Student's unique needs, to help ensure that Ms. Zika's assessment of Student was as thorough as possible regarding Student's language processing skills. Ms. Zika assessed Student in September and October 2006, and recommended that Student receive two 30-minute sessions of individual SLT per week.

27.    As noted above, District concedes that it failed to provide Student with SLT from the start of the 2006-2007 SY until the District was ready to conduct an IEP on November 13, 2006. Student is entitled to compensatory SLT to remedy this denial of a FAPE. If the IEP team meeting had been held as scheduled, Ms. Zika would have recommended that Student receive two 30-minute sessions of individual SLT per week, which Ms. Zika was ready to provide to Student. Therefore, Student is only entitled to compensatory education for approximately 11 weeks from the beginning of the 2006-2007 SY on August 31, 2006, to November 13, 2006.

28.    The only evidence of the appropriate amount of SLT for Student was Ms. Zika's testimony regarding her recommendation of two 30-minute individual sessions per week. Given the extent of Student's speech and language disability, and its effect on Student's academic performance, the appropriate compensatory education is on a two-to-one ratio. Accordingly, Student is entitled to 22 hours of compensatory SLT, to remedy the denial of a FAPE.

*Mother's Requests for a Copy of Student's Educational Records*

29.    Education Code section 56504 establishes the right of a parent to receive a complete copy of a pupil's educational records within five days of making a written request for such records. However, the jurisdiction of OAH is limited to issues related to the proposal or refusal to initiate or change the identification, assessment, or educational placement of a child, or the provision of a FAPE to a child, or the refusal of a parent or guardian to consent to an assessment of a child, or a disagreement between a parent or guardian and the district as to the availability of a program appropriate for a child. (Ed. Code, § 56501, subd. (a).) Accordingly, compliance with the five-day requirement is the proper subject matter of a compliance complaint to the California Department of Education, rather than a request for due process hearing filed with OAH. However, in this matter, Student alleged not only failure to comply with the five-day rule, but also that the District withheld documents and in so doing significantly impeded Mother's opportunity to participate in the decision-making process.

30.    On October 5, 2006, Mother brought a written request for Student's records to the KMS main office, which was promptly brought to the attention of Ms. Ryan. Mother said that the records she was requesting were to provide information to a tutor. Ms. Ryan wrote a note on Mother's request indicating that she was providing to Mother Student's latest IEP and Student's test scores, because that is what she thought would be helpful to the tutor.

31.    While it is obvious that Mother sincerely cares about her son's well-being, for various reasons her testimony was unreliable. Although Mother never informed District personnel prior to the hearing, she has continuing disabilities that affect her memory, and her abilities to tell time and understand words. At times, Mother's disabilities resulted in confusing or contradictory testimony. Mother thought she had first requested Student's records in September 2006, and that she had gone to KMS several times to request Student's records. However, Ms. Ryan only recalled the records request of October 5, 2006. In addition, Mother could not clearly remember what documents District produced to her, or when the District produced documents. For example, Mother believed that the District had initially given her a thin envelope containing some, but not all, of Student's IEPs. However, at another point in her testimony she agreed that, if Student had only three IEPs and an addendum as of Fall 2006, she had been given all of Student's IEPs.

32.    Other factors negatively impacted the credibility of Student's case. Mother's attorney prepared the Complaint, but Mother did not review it before it was filed. The Complaint makes the following allegations, among others: (1) Student was not recommended for ESY after the 2005-2006 SY (p. 4, lines 8-9);[2] (2) Student was "exited" from special education (p. 4, lines 18-19); (3) District failed to present Mother with an

_____
[2] Mother testified that the District did not provide ESY for Summer 2005, because she never received the ESY form from the District, even though she contacted the school and Ms. Marsh said that she would send the form home in Student's backpack. However, Mother's testimony in this regard was not credible, because Ms. Marsh established that she taught Student during Summer 2004 and Summer 2005.

assessment plan (p. 5, line 25); and (4) Mother did not consent to the "recent testing" (p. 4, line 22).[3] However, during Mother's testimony at the hearing, she conceded that: (1) each of Student's three IEPs indicated that ESY was recommended; (2) Student was never exited from special education; and (3) District presented an assessment plan to her, which she signed. Accordingly, the Complaint contains at least four demonstrably false allegations.

33.     The District practice was to give parents a copy of the IEP at the conclusion of the IEP team meeting. Ms. Marsh, Student's fourth and fifth grade SDC teacher, attended the 2004 and 2005 IEPs. Mother was given a copy of the IEP at the conclusion of those IEP team meetings.

34.     District concedes that its initial production of Student's educational records to Mother may not have been complete. On October 20, 2006, Mother's attorney wrote District a letter requesting Student's complete educational records. In response, District provided a copy of Student's educational records to Mother's attorney. District supplemented its production of Student's educational records at the mediation on February 1, 2007.

35.     District's production of Student's records to Mother or Mother's attorney, or the lack thereof, did not in any way affect Student's placement. As determined in Factual Findings 13 through 24, District properly placed Student in a KMS GE classroom with Resource support, in the absence of an updated IEP. Nor did District's production of Student's records, or lack thereof, significantly impede Mother's opportunity to participate in the IEP process, because Mother unreasonably refused to participate in the IEP process, choosing instead to refer all District employees to her attorney, who unreasonably refused to participate in the IEP process until the parties had been to mediation. Accordingly, the manner and amount of District's production of Student's records did not constitute a material procedural violation of Student's right to a FAPE.

*Prior Written Notice*

36.     A school district must provide written notice to the parent of a disabled child a reasonable time before the district proposes or refuses to initiate or change the identification, evaluation, or educational placement of provision of a FAPE to the child.

37.     As determined in Factual Findings 3 through 9, the lack of an IEP team meeting during the 2006-2007 SY, with the exception of six weeks of delay, is the result of the unreasonable actions of Mother and Mother's attorney. As a result, the District was not required to provide prior written notice to Mother regarding the failure to hold an IEP.

---

[3] Mother testified that her disabilities prevented her from understanding all of the words in all of the documents. However, Ms. Ryan called Mother before sending home the assessment plan, and explained to Mother the document itself, its purpose, and the fact that she (Ms. Ryan) would be contacting Mother again, for an IEP team meeting, so that the assessment results could be explained and discussed.

38.    As determined in Factual Findings 13 through 17, the movement of Student from a SDC to a GE classroom, within the first week of his first year in middle school, was simply an appropriate correction of a clerical error, which the District was required to make to comply with Student's IEP, rather than a change in placement. Thus, District was not required to send prior written notice to Mother before correcting its error.

39.    As determined in Factual Findings 18 through 24, Student's placement in a KMS GE classroom with Resource support from Ms. Ryan conformed to the placement called for in the IEP dated September 29, 2005, was designed to meet Student's unique needs, and was reasonably calculated to provide some educational benefit. As a result, the District was not required to provide prior written notice to Mother regarding Student's 2006-2007 placement and services before holding an IEP team meeting, the purpose of which would have been to design appropriate placement and services.

## APPLICABLE LAW PRINCIPLES

1.    Student has the burden of proving the essential elements of his special education claims. (*Schaffer v. Weast* (2005) 546 U.S. 49 [126 S.Ct. 528, 163 L.Ed.2d 387].)

2.    A child with a disability has the right to a FAPE. (20 U.S.C. §1412(a)(1)(A);[4] Ed. Code, § 56000.) A FAPE is defined in pertinent part as special education and related services that are provided at public expense and under public supervision and direction, that meet the State's educational standards, and that conform to the student's IEP. (§ 1401(9); Cal. Code Regs., tit. 5, § 3001, subd. (o).) "Special education" is defined in pertinent part as specially designed instruction and related services, at no cost to parents, to meet the unique needs of a child with a disability. (§ 1401(29); Ed. Code, § 56031.) "Related services" or DIS means transportation and other developmental, corrective and supportive services as may be required to assist the child to benefit from special education. (§ 1401(22); Ed. Code, § 56363, subd. (a).) Placement is defined as the "unique combination of facilities, personnel, location or equipment necessary to provide instructional services to an individual with exceptional needs, as specified in the [IEP], in any one or a combination of public, private, home and hospital, or residential settings." (Cal. Code Regs., tit. 5, § 3042.)

3.    There are two parts to the legal analysis in suits brought pursuant to the IDEA. First, the court must determine whether the school system has complied with the procedures set forth in the IDEA. (*Bd. of Ed. of the Hendrick Hudson Sch. Dist v. Rowley* (1982) 458 U.S. 176, 200 [*Rowley*].) Second, the court must assess whether the IEP developed through those procedures was designed to meet the child's unique needs, reasonably calculated to enable the child to receive educational benefit, and comported with the child's IEP. (*Id.* at pp. 206-207.)

---

[4] All statutory references are to the Individuals with Disabilities Education Improvement Act (IDEA), title 20 of the United State Code, unless specifically noted otherwise.

ʊ

4.    In *Rowley*, the United States Supreme Court recognized the importance of adherence to the procedural requirements of the IDEA. But procedural violations constitute a denial of FAPE only if the violations caused a loss of educational opportunity to the student or significantly infringed on the parents' right to participate in the IEP process. (*Rowley, supra,* 458 U.S. at pp. 206-207; *M.L. v. Federal Way Sch. Dist.* (9th Cir. 2004) 394 F.3d 634, 646; *M.M. v. Sch. Dist. of Greenville County* (4th Cir. 2002) 303 F.3 523, 534; *Amanda J. v. Clark County Sch. Dist.* (9th Cir. 2001) 267 F. 3d 877, 892.)

5.    A school district must conduct reassessments of a pupil receiving special education and related services, and hold IEP team meetings, after the initial assessment that established eligibility. (§ 1414(a)(2)(A); 34 C.F.R. § 300.303(a); Ed. Code, § 56381, subd. (a)(2).) The reassessments and resulting IEP team meetings need not occur more frequently than once a year, but must be done no less than every three years, unless the parent and the public agency agree that reevaluation is unnecessary. (§ 1414(a)(2)(B)(i) and (ii); 34 C.F.R. § 300.303(b); Ed. Code § 56381, subd. (a)(2).)

6.    Parents have a right to review the District's proposed assessment plan before deciding whether to consent to the plan, and the right to receive a copy of the report of any assessment performed on the child. (Ed. Code, §§ 56043, subds. (a) & (b); 56329, subd. (a).) Parents also have the right to examine, and to receive a copy of, "all school records of the child." (Ed. Code, §56504; see also 34 C.F.R. § 300.501(a) ["The parents of a child with a disability must be afforded . . . an opportunity to inspect and review all education records with respect to (1) The identification, evaluation, and educational placement of the child; and (2) The provision of FAPE to the child."].)

7.    Another procedural requirement, found in both State and federal law, requires that the parents of a child with a disability be afforded an opportunity to participate in meetings with respect to the identification, assessment, educational placement and provision of a FAPE to the child. (Ed. Code, §§ 56304, 56342.5; 34 C.F.R. § 300.501(b).) Thus, parents are required members of the IEP team. (§ 1414(d)(1)(B)(i); 34 C.F.R. § 300.321(a) (1); Ed. Code, § 56341, subd. (b)(1).) Education Code section 56341.1 also requires the IEP team to consider, among other matters, the strengths of the pupil and the results of the initial assessment or most recent assessment of the pupil. The IEP team must consider the concerns of the parents throughout the IEP process. (§ 1414(c)(1)(B), (d)(3)(A)(i), (d)(4)(A)(ii)(III); 34 C.F.R. §§ 300.305(a)(i), 300.324(a)(1)(ii), (b)(1)(ii)(C); Ed. Code, § 56341.1, subds. (a)(1), (d)(3), (e).)

8.    Another key aspect of the parents' right to participate in the IEP process is the school district's obligation to provide prior written notice whenever the school district "refuses to initiate or change the . . . educational placement of the child, or the provision of a [FAPE] to the child." (§ 1415(b)(3)(b); 34 C.F.R. § 300.503(a).) The notice is to contain: (1) a description of the action refused by the agency, (2) an explanation for the refusal, along with a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the refusal, (3) a statement that the parents of a disabled child are entitled to procedural safeguards, with the means by which the parents can obtain a copy of those

procedural safeguards, (4) sources of assistance for parents to contact, (5) a description of other options that the IEP team considered, with the reasons those options were rejected, and (6) a description of the factors relevant to the agency's refusal. (§ 1415(c)(1); 34 C.F.R. § 300.503(b).)

9.    As noted in Applicable Law Principle 3, the second prong of the *Rowley* test analyzes substantive appropriateness, specifically, the level of instruction and services that must be provided to a student with disabilities to satisfy the IDEA's requirements. The *Rowley* Court determined that a student's IEP must be designed to meet the student's unique needs, be reasonably calculated to provide the student with some educational benefit, and comport with the student's IEP. (*Rowley, supra*, 458 U.S. at pp. 188-189, 200-201.) To determine whether the District offered Petitioner a FAPE, the analysis must focus on the adequacy of the District's proposed program. (*Gregory K. v. Longview Sch. Dist.* (9th Cir. 1987) 811 F.2d 1307, 1314.) Liability will only be imposed on a school district for "material" failures to implement an IEP. (*Van Duyn v. Baker School District* (9th Cir. 2007) 481 F.3d 770.)

10.    An IEP need not conform to a parent's wishes in order to be sufficient or appropriate. (*Shaw v. Dist. of Columbia* (D.D.C. 2002) 238 F.Supp.2d 127, 139 [IDEA does not provide for an "education . . . designed according to the parent's desires"], citing *Rowley, supra*, 458 U.S. at p. 207.) Nor does the IDEA require school districts to provide special education students with the best education available or to provide instruction or services that maximize a student's abilities. (*Rowley, supra,* 458 U.S. at pp. 198-200.) Rather, the *Rowley* Court held that school districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instructional and related services which are individually designed to provide educational benefit to the student. (*Id.* at p. 200.) Hence, if the school district's program met the substantive *Rowley* factors, then that district provided a FAPE, even if petitioner's parents preferred another program and even if his parents' preferred program would have resulted in greater educational benefit. (*Gregory K., supra,* 811 F.2d at p. 1314.)

11.    Parents may be entitled to appropriate relief, including reimbursement for the costs of placement or services that they have independently obtained for their child, when the school district has failed to provide a FAPE and the private placement or services are determined to be proper under the IDEA and are reasonably calculated to provide educational benefit to the child. (*School Committee of the Town of Burlington v. Department of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996, 85 L.Ed.2d 385] (*Burlington*); *Student W. v. Puyallup School District* (9th Cir. 1994) 31 F.3d 1489, 1496.) Court decisions subsequent to *Burlington* have also extended relief in the form of compensatory education to students who have been denied a FAPE. (See, e.g., *Todd v. Andrews* (11th Cir. 1991) 933 F.2d 1576; *Lester H. K. Gilhool and the Chester Upland School District* (3d Cir. 1990) 916 F.2d 865; *Miener State of Missouri* (8th Cir. 1986) 800 F.2d 749.) Compensatory education is an equitable remedy. (*Student W., supra,* 31 F.3d at pp. 1496-1497.) There is no obligation to provide day-for-day or hour-for-hour compensation. "Appropriate relief is

relief designed to ensure that the Student is appropriately educated within the meaning of the IDEA." (*Student W., supra*, 31 F.3d at p. 1497.)

## LEGAL CONCLUSIONS

*Issue 1: Did the District deny Student a FAPE by not conducting an annual IEP for Student from September 29, 2006, to the present?*

12.    Based on Factual Findings 1 through 12, and Applicable Law Principles 1 through 5, the District violated Student's right to a FAPE by failing to conduct Student's annual IEP by September 29, 2006, and for the six-week delay until the District initially scheduled Student's IEP team meeting on November 13, 2006. However, based on Factual Findings 1 through 12, District's responsibility for holding an IEP ended on November 13, 2006, based on the unreasonable refusal of Mother and Mother's attorney to participate in the IEP process.

*Issue 2: Did the District deny Student a FAPE from August 31, 2006, through the present by moving Student from a SDC to a GE classroom without Mother's consent?*

13.    Based on Factual Findings 12 through 16, and Applicable Law Principles 1 through 4 and 7, Student's placement in a KMS SDC at the start of the 2006-2007 SY was the result of a District clerical error. Therefore, the District's movement of Student from the SDC to a GE classroom with Resource support did not constitute a change in placement. Rather, District's movement of Student was simply the prompt correction of its clerical error. The District was required to move Student to the GE classroom with Resource support to comply with Student's IEP of September 29, 2005, the IEP in effect at the time, and to provide Student with a FAPE. Accordingly, the District was not required to obtain Mother's consent to move Student.

*Issue 3: Did the District deny Student a FAPE from August 31, 2006, through the present by failing to provide Student with a placement and services designed to meet Student's unique needs and reasonably calculated to provide some educational benefit in conformity with the IEP?*

14.    Based on Factual Findings 13 through 28, and Applicable Law Principles 1 through 3 and 9 through 11, Student's placement in the KMS GE classroom with Resource support complied with the last consented-to IEP, dated September 29, 2005. The placement conformed with that IEP by providing Resource support on both a push-in and a pull-out basis, for approximately the same amount of time as provided for in that IEP. The placement was reasonably calculated to provide some educational benefit, and was designed to meet Student's unique needs in the areas of reading comprehension and math problem solving, due to a significant language impairment or auditory processing disorder, both expressive and receptive, as well as attention issues (focus, organization, and distractability). Therefore, Student's KMS placement was appropriate, except for the lack of SLT.

15.    Based on Factual Findings 17 through 21, and Applicable Law Principles 1 through 4 and 9 through 11, the District violated Student's right to a FAPE by failing to provide SLT from the start of the 2006-2007 SY on August 31, 2006, until November 13, 2006, when it was ready to conduct an IEP team meeting. This constitutes a denial of FAPE to Student for a period of approximately 11 weeks. Student required 1 hour per week of individual SLT. In addition, Student would have made additional academic progress had he received the SLT. Accordingly, District must provide 22 hours of compensatory individual SLT to Student to remedy this violation of Student's right to a FAPE.

*Issue 4: Did the District deny Student a FAPE by not timely producing Student's educational records to Mother, and by not producing Student's completed educational records?*

16.    Based on Factual Findings 28 through 34, and Applicable Law Principles 1 through 4 and 6, District's production of Student's records to Mother or Mother's attorney, or the lack thereof, was not a meaningful procedural violation because it did not in any way affect Student's placement. District properly placed Student in a KMS GE classroom with Resource support, except for the lack of SLT. Nor did the production of Student's records, or lack thereof, significantly impede Mother's opportunity to participate in the decision-making process, because Mother and Mother's attorney unreasonably refused to participate in the IEP process.

*Issue 5: Did the District procedurally deny Student a FAPE by failing to provide Mother with prior written notice regarding the change of Student's placement from a SDC to a GE classroom; failing to hold Student's annual IEP team meeting; and failing to design an educational placement to meet Student's unique needs?*

17.    Based on Factual Findings 13 through 17, and Applicable Law Principles 1 through 4 and 8, District's movement of Student from the KMS SDC to a GE classroom with Resource support was not a change in placement requiring prior written notice.

18.    Based on Factual Findings 1 through 12, and Applicable Law Principles 1 through 4, 7, 8, 10, and 11, because of the unreasonable refusal of Mother and Mother's attorney to participate in the IEP process, the District is only responsible for failing to hold an IEP from September 29, 2006, to November 13, 2006.

19.    Based on Factual Findings 1 through 12 and 23 through 28, and Applicable Law Principles 1 through 4, 7, 8, 10, and 11, as to Student's educational placement, because of the unreasonable refusal of Mother and Mother's attorney to participate in the IEP process, the District is only responsible for failing to provide SLT during the 11 weeks between the beginning of the 2006-2007 SY on August 31, 2006, and November 13, 2006. Both of these violations will be addressed via the award of compensatory individual SLT. The District committed no other meaningful procedural violations of Student's right to a FAPE.

## ORDER

1.    Student's claims and proposed resolutions, except as to the District's failure to hold an IEP for six weeks, and to provide SLT for 11 weeks, are denied.

2.    District shall provide 22 hours of compensatory individual SLT to Student.

## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires a decision to indicate the extent to which each party prevailed on each issue heard and decided. Student prevailed on portions of Claims 1 and 3. However, District conceded the basis for the two partial claims on which Student prevailed. The District prevailed on Claims 2, 4, and 5, and on the remaining portions of Claims 1 and 3 on which Student partially prevailed.

## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within ninety (90) days of receipt of this decision. (Ed. Code, § 56505, subd. (k).)

Dated: May 18, 2007

JOHN A. THAWLEY
Administrative Law Judge
Special Education Division
Office of Administrative Hearings

16

1    TO ALL PARTIES AND TO THER RESPECTIVE ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE that on January 17, 2008 at 10:30 AM, or as soon thereafter as

3  the matter may be heard in Courtroom C of the above-entitled Court, located at 450 Golden Gate

4  Street, San Francisco, California, Counter-Defendants ADAMS ESQ, A Professional Corporation

5  ("Adams Esq") and Jean Murrell Adams ("JMA") will and hereby does move this Court for an

6  order dismissing with prejudice Counter-Claimant Berkeley Unified School District's claim for

7  relief against Counter-Defendants JMA and Adams Esq on the grounds the Counter-Complaint

8  fails to state a claim under Fed. R. Civ. P. 12(b)(6); or alternatively, for a more definite statement

9  under Fed. R. Civ. P. 12(e); and dismissal of the Counter-Complaint. As to Counter-Defendants

10  JMA and Adams Esq on grounds that they are not proper parties under Fed. R. Civ. P. 13 and 14.

11  Should the Court allow JMA to remain as a party in her individual capacity as a Counter-

12  Defendant, then the Moving Parties request dismissal of the Counter-Complaint for failure to state

13  a claim.

14    This motion is based upon this Notice of Motion, the attached Memorandum of Points and

15  Authorities, the Declaration of Jean Murrell Adams, the evidence presented herewith, the pleadings

16  and papers on file herein and such further documentary or oral evidence as my be presented at the

17  hearing.

18

19

20  Dated: November 21, 2007                    Respectfully submitted,

21                                               ADAMS ESQ

22

23

24                                               JEAN MURRELL ADAMS
                                                 Attorneys for Plaintiff, Keisha Hawkins
25                                               and Counter-Defendant, Adams ESQ,
                                                 A Professional Corporation and
26                                               Jean Murrell Adams

27

28

ADAMS ESQ
A Professional Corporation
...
...
...

MOTION TO DISMISS                    -1-                    BUSD V. ADAMS ESQ & JMA
                                                           C07-CV-04206-EMC