ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A Professional Corporation
Peter W. Sturges, State Bar No. 148124
Diane B. Rolen, State Bar No. 153566
5776 Stoneridge Mall Road, Suite 200
Pleasanton, California 94588
Telephone: (925) 227-9200
Facsimile: (925) 227-9202
Email: psturges@aalrr.com
Attorneys for BERKELEY UNIFIED SCHOOL
DISTRICT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEISHA HAWKINS,<br><br>                          Plaintiff,<br><br>vs.<br><br>BERKELEY UNIFIED SCHOOL DISTRICT,<br><br>                          Defendant. | CASE NO.:        C07-CV-04206-EMC<br><br>**DECLARATION OF DIANE B. ROLEN IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS COUNTERCLAIM**<br><br>JUDGE:        Hon. Edward M. Chen<br>DATE:         January 23, 2008<br>TIME:         10:30 a.m.<br>DEPT:         Courtroom C, 15th Fl. |
| BERKELEY UNIFIED SCHOOL DISTRICT, et al,<br><br>                          Counter-Claimant,<br><br>vs.<br><br>ADAMS ESQ., A PROFESSIONAL CORPORATION, JEAN MURRELL ADAMS, AND DOES 1-20.<br><br>                          Counter-Defendant. | |

I, Diane B. Rolen, do hereby declare as follows:

1.        I am an attorney with the law firm of Atkinson, Andelson, Loya, Ruud & Romo, counsel of record for Defendant and Counter-Claimant Berkeley Unified School District ("District") in the above-entitled matter. I am personally familiar with the following and could testify to it if called upon to do so.

Declaration Of Diane B. Rolen In Support Of Opposition To Motion To Dismiss Counterclaim

1    2.    Attached to this Declaration as Exhibit A is a true and correct copy of the

2  Decision filed by Administrative Law Judge John A. Thawley following the underlying

3  administrative due process hearing in this matter, *Student v. Berkeley Unified School District,*

4  Office of Administrative Hearings Case No. N2006110033.

5    3.    Attached to the Declaration as Exhibit B is a true and correct copy of *Taylor P. et*

6  *al. v. Missouri Dept. of Elementary and Secondary Education, et al.,*(W.D. Mo., Aug. 14, 2007,

7  Case No. 06-4254-CV-C-NKL) 2007 U.S. Dist. Lexis 59570.

8    I declare under penalty of perjury under the laws of the State of California that the

9  foregoing is true and correct, and that this Declaration was executed on January 2, 2008, at

10  Pleasanton, California.

11  DATED:  January 2, 2008

ATKINSON, ANDELSON, LOYA, RUUD & ROMO

By: _Diane B. Rolen_____

Diane B. Rolen
Attorneys for BERKELEY UNIFIED SCHOOL
DISTRICT

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
5776 STONERIDGE MALL ROAD, SUITE 200
PLEASANTON, CALIFORNIA 94588
TELEPHONE: (925) 227-9200
FACSIMILE: (925) 227-9202

-2-

Declaration Of Diane B. Rolen In Support Of Opposition To Motion To Dismiss Counterclaim

**EXHIBIT A**

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matter of:

STUDENT,

               Petitioner,

v.

BERKELEY UNIFIED SCHOOL DISTRICT,

               Respondent.

OAH CASE NO. N2006110033

## DECISION

John A. Thawley, Administrative Law Judge (ALJ), Office of Administrative Hearings, Special Education Division (OAH), State of California, heard this matter on April 2 through 4 and 10, 2007, in Oakland, California.

Jean Adams and Laurette Garcia, Attorneys at Law, represented Petitioner (Student). Student's Mother attended the hearing.

Peter Sturges and Diane Rolen, Attorneys at Law, represented Respondent Berkeley Unified School District (District). Elaine Eger, District Special Education Manager, attended the hearing.

Student's due process hearing request was filed on November 1, 2006. A continuance was granted on December 22, 2006. Oral and documentary evidence were received. The record was held open for the submission of closing briefs by April 30, 2007. The briefs were timely filed, the record closed, and the matter was submitted on April 30, 2007.

EXHIBIT A

## ISSUES[1]

1. Did the District deny Student a free, appropriate public education (FAPE) by not conducting an annual individualized education plan (IEP) team meeting for Student from September 29, 2006, to the present?

2. Did the District deny Student a FAPE from August 31, 2006, through the present by moving him from a special day class (SDC) to a general education (GE) classroom without Mother's consent?

3. Did the District deny Student a FAPE from August 31, 2006, through the present by failing to provide him with a placement and services designed to meet his unique needs and reasonably calculated to provide some educational benefit in conformity with the IEP?

4. Did the District deny Student a FAPE by not timely producing his educational records to Mother, and by not producing his complete educational records?

5. Did the District procedurally deny Student a FAPE by failing to provide Mother with prior written notice regarding the change of Student's placement from a SDC to a GE classroom, failing to hold Student's annual IEP team meeting, and failing to design an educational placement to meet Student's unique educational needs?

## PARTIES' CONTENTIONS

Student contends that: (1) the District did not hold an annual IEP when it was due, on September 29, 2006; (2) the District did not provide written notice to Mother of the IEP team meeting scheduled for November 13, 2006; (3) the District unilaterally cancelled the IEP team meeting of November 13, 2006, and bears responsibility for failing to re-schedule the meeting; (4) the District should have held an IEP team meeting and obtained Mother's consent before moving Student from a SDC to a GE classroom during Student's first week of the 2006-2007 school year (SY) at King Middle School (KMS); (5) the District failed to provide speech and language therapy (SLT) to Student from the start of the 2006-2007 SY, on August 31, 2006, until February 2, 2007 (the day after the mediation); (6) District improperly asked Mother the purpose for her first request for a copy of Student's educational records, and then improperly provided only those records that the District thought were required; and (7) District's response to Mother's requests for Student's educational records was incomplete, to the point that District produced one document for the first time during the hearing. Student seeks, among other things, independent assessments, 300 hours of compensatory education, and an IEP team meeting within 60 days of the hearing.

---

[1] The ALJ has clarified the issue statements according to the evidence presented at the due process hearing.

District concedes that Student's annual IEP was late, because it was due on September 29, 2006, but was not scheduled until November 13, 2006. District also concedes that it failed to provide Student with SLT from the start of the 2006-2007 SY. However, as to the remainder of Student's claims, District argues that: (1) the IEP team meeting scheduled for November 13, 2006, was cancelled because Mother refused to attend; (2) Mother never re-scheduled the IEP team meeting, even though District attempted to contact Mother to re-schedule the meeting; (3) Mother told District personnel that she could not talk to them and that they would have to talk with her attorney; and (4) Mother's attorney refused to hold the IEP team meeting until the resolution session or mediation occurred. District argues that the cut-off date for its failure to provide SLT should be November 13, 2006, because, had the IEP team meeting been held, District would have recommended and provided SLT following that meeting. District also asserts that the movement of Student from an SDC to a GE classroom during the first week of his first year in middle school was simply the prompt correction of a clerical error, to ensure compliance with the most recent and consented-to IEP dated September 29, 2005, and was not a change in placement that required an IEP and Mother's consent. The District argues that Mother verbally indicated that the purpose for her first written request for records was to assist with a church tutoring program, which led to District confusion as to what records Mother was seeking, but that the District provided all of the records. The District asserts that any delay in providing Student's records did not deny Student an educational benefit or prevent Mother from meaningfully participating in the IEP process. The District argues that prior written notice was not required to correct the clerical error that resulted in Student mistakenly being placed in a SDC at the start of the 2006-2007 SY. The District also argues that prior written notice was not required for the failure to hold an IEP team meeting, because the District was ready to conduct an IEP team meeting as of November 13, 2006, tried to re-schedule the IEP team meeting, and remains ready to the present day to hold the IEP team meeting.

## FACTUAL FINDINGS

1.    Student was born December 26, 1993, and lives within the District's boundaries. He was initially found eligible for special education and related services during the 2003-2004 SY due to speech and language difficulties. For the 2003-2004 SY, Student was placed in a SDC for the Communicatively Handicapped (CH). The SDC CH was taught by Cheryl Marsh, a credentialed SE teacher and speech and language therapist, who included SLT in the context of the core curriculum. Over the course of the next two SYs, the time that Student spent in a GE classroom increased, and the SDC CH evolved into a Learning Center that supported both SE and GE pupils. Pursuant to a mediation agreement between the parties, Student was moved to a SDC at King Middle School (KMS) on February 2, 2007.

*The annual IEP team meeting that was due on September 29, 2006*

2.    A school district must conduct reassessments of a pupil receiving special education and related services, and hold IEP team meetings, after the initial assessment that established eligibility. The reassessments and IEP team meetings need not occur more

3

frequently than once a year, but must be done no less than every three years (frequently
called "triennial" assessments and IEP).

3.    Student's annual IEP was due on September 29, 2006. Mother signed the
triennial assessment plan on about September 11, 2006. The District concedes that, as of
September 29, 2006, it had not completed the triennial assessment, and therefore was not
ready to conduct the annual IEP to review the triennial assessment results.

4.    Susan Ryan, Student's resource teacher at KMS, was responsible for
organizing and scheduling IEP team meetings. Ms. Ryan called Mother on November 2,
2006, regarding Student's IEP team meeting. On November 6, 2006, Ms. Ryan prepared the
IEP team meeting notices for Mother and the appropriate District personnel, indicating that
Student's IEP team meeting was scheduled for November 13, 2006. Ms. Ryan also prepared
a draft IEP.

5.    At some point during the week that Ms. Ryan was working on Student's draft
IEP and preparing for the IEP team meeting, Ms. Ryan called Mother. During one of Ms.
Ryan's phone calls to Mother, Mother told Ms. Ryan that she would not be able to attend the
IEP team meeting on November 13, 2006, because her daughter had an IEP team meeting at
her school. Mother told Ms. Ryan that she would call back to re-schedule Student's IEP
team meeting. Mother never did so.

6.    During another phone call from Ms. Ryan to Mother, Mother declined to speak
with Ms. Ryan, and told Ms. Ryan that she would have to talk to Mother's attorney. Ms.
Ryan called Mother's attorney, who told her that the IEP team meeting would have to be put
on hold until the mediation in this matter had occurred. Ms. Ryan suggested that it would
make sense to hold the IEP team meeting because the results of the assessments of Student
were available, and because the IEP team could discuss or answer any questions about
Student's placement. Mother's attorney told Ms. Ryan that those issues were different than
the substance of the mediation, and would be dealt with when the IEP team met. On
November 9, 2006, Ms. Ryan made a calendar note that Student's IEP team meeting had
been postponed.

7.    Amy Rosenbaum, Ph.D., the District school psychologist, conducted the
triennial psycho-educational assessment of Student in about late October or early November
2006. As part of the assessment, Dr. Rosenbaum called Mother. Dr. Rosenbaum told
Mother that she was calling, as part of the triennial assessment, to hear Mother's thoughts
about Student, how he was doing in school, and any concerns Mother might have. Mother
told Dr. Rosenbaum that she could not talk to her, and that Dr. Rosenbaum would have to
call Mother's attorney. However, Mother did not provide her attorney's name or phone
number. Dr. Rosenbaum did not contact Mother again. Dr. Rosenbaum talked with her
supervisor, Doctor Donald Klose, and Ms. Ryan, and was told that the IEP was "on hold."

8.    Dr. Klose sent a letter to Mother on January 23, 2007, to attempt to re-
schedule the IEP team meeting for February 9, 2007. District received no response. Mother

admitted that the letter was sent to her correct address, but testified that she did not receive the letter. However, as discussed further in Factual Finding 31, Mother's testimony in this regard is not credible. Mother admitted that she had a poor memory, and that she "could have" received the letter, because she receives "so much" mail from the District.

9.     The District was ready to conduct Student's IEP team meeting no later than Monday, November 13, 2006, which is about six weeks after the IEP team meeting was due. However, Mother unreasonably refused to attend an IEP team meeting, and Mother's attorney unreasonably insisted that any IEP team meeting must be held after mediation. As a result, District is excused from not holding an IEP team meeting after November 13, 2006. Accordingly, the District is not responsible for any more than six weeks of delay in the holding of an IEP team meeting.

10.     Procedural violations constitute a denial of FAPE only if the violations impeded a pupil's right to a FAPE, caused a deprivation of educational benefits, or significantly impeded the parents' right to participate in the decision-making process regarding the provision of a FAPE to the parents' child. The failure to hold an IEP team meeting for six weeks did not significantly impede Mother's right to participate in the IEP process, in light of the fact that Mother indicated that she could not attend the IEP team meeting, unreasonably refused to communicate with Ms. Ryan and Dr. Rosenbaum, unreasonably failed to respond to the District's attempt to re-schedule the meeting, and unreasonably did not attempt to re-schedule the meeting.

11.     As to whether the procedural violation of failing to hold the IEP team meeting impeded the Student's right to a FAPE, or caused a deprivation of educational benefits, Factual Findings 18 through 28 establish that Student's educational program at KMS was appropriate, with the exception of the District's failure to provide SLT. As noted in Factual Findings 25 through 28, District violated Student's right to a FAPE by failing to provide SLT from August 31, 2006, to November 13, 2006. Therefore, any loss of educational opportunity to Student, which would entitle Student to compensatory education for the District's procedural violation of failing to hold an IEP team meeting, will be awarded to Student for the District's demonstrated and conceded failure to provide SLT.

12.     Student asserts that the District committed a procedural violation of his right to a FAPE by not providing Mother with written notice of the IEP team meeting scheduled for November 13, 2006. Ms. Ryan prepared a notice of the IEP team meeting but was not certain that she sent it to Mother. However, even assuming that the District failed to provide written notice of the IEP team meeting, Student has not demonstrated the denial of a FAPE, the deprivation of an educational opportunity, or a significant impediment on Mother's opportunity to participate in the decision-making process, for the reasons discussed in Factual Findings 10 and 11. Accordingly, any violation was not material and did not constitute a procedural denial of a FAPE.

*The District's Movement of Student from a SDC to a GE classroom*

13.    School districts must provide each pupil who is found eligible for special education and related services with an appropriate placement, which is defined as the unique combination of facilities, personnel, location or equipment necessary to provide instructional services to the pupil, as specified and detailed in the pupil's IEP. Any change of placement for a special education pupil must be accomplished via the IEP team meeting process, with the consent of the pupil's parent or guardian.

14.    Student's IEP of September 29, 2005, was in effect on Student's first day at KMS at the start of the 2006-2007 SY. The IEP called for Student to be educated in a GE classroom for up to 70 percent of his school day, and to receive SDC support, in the Learning Center Support model, for at least 45 minutes per school day, and up to 90 minutes per school day. The IEP indicated that 39 percent of Student's school day would be spent in special education.

15.    On the first day of the 2006-2007 SY at KMS, Student was on Ms. Ryan's caseload, but she did not find him in the GE classroom where she expected to see him. Instead, she saw him in a SDC. However, there were often placement mistakes at the start of the school year for sixth grade pupils who were entering middle school.

16.    Dr. Klose was also surprised to see Student in the SDC. Dr. Klose pointed out that, per Student's most recent IEP, Student was not supposed to be in the SDC, and it would constitute a change of placement if he were allowed to stay in the SDC. By the second week of school, Student was moved into a GE classroom with Resource support from Ms. Ryan.

17.    District's placement of Student in a KMS SDC, at the start of the 2006-2007 SY, was not consistent with the IEP in effect at the time, dated September 29, 2005. As a result, District was required to move Student from the SDC to a GE classroom to comport with the IEP and to correct the District's error. Accordingly, the movement was not a change in placement, and District was not required to hold an IEP and/or to obtain parental consent before correcting the initial, erroneous SDC placement.

*Student's Unique Academic Needs as of the Start of the 2006-2007 SY*

18.    A school district must offer a FAPE that is designed to meet a pupil's unique needs, is reasonably calculated to provide some educational benefit, and is in conformity with the pupil's IEP.

19.    The parties do not dispute that: (1) Student's strengths include encoding and decoding words; (2) Student requires SLT; and (3) Student has unique needs in the areas of reading comprehension and math problem solving, due to a significant language impairment or auditory processing disorder, both expressive and receptive, as well as attention issues (focus, organization, and distractability).

20.    Student's IEP of September 29, 2005, contained eight goals in the areas of social/emotional skills, language, reading comprehension, writing, and math.  Ms. Marsh, Student's SDC teacher during the 2005-2006 SY, established that Student received an average of 90 minutes per day of special education support from the SDC Learning Center. Student's Learning Center support was provided both in his GE classroom ("push-in") and in other locations outside the classroom, such as the Learning Center ("pull-out").

21.    Student's placement (educational program) in a KMS GE classroom with Resource support was the equivalent of Student's placement for the 2005-2006 SY, in light of the fact that KMS did not have a SDC Learning Center. When Ms. Ryan assessed Student in September 2006, she found that he had a range of skills, which were within the range of skills she worked on with other pupils who received Resource support. Ms. Ryan or her assistant supported Student with both push-in and pull-out Resource services, on a one-to-one basis and in small groups. The support occurred in Student's morning English-History class, and in Student's afternoon Math-Science combination class. Ms. Ryan spent substantial time with Student because, among her caseload of six pupils, she believed he was one of her highest-need pupils. Ms. Ryan was in Student's class for approximately 45 to 90 minutes per day. Ms. Ryan provided credible testimony regarding the support she provided for Student, in light of her experience, which consisted of over 30 years of teaching, 22 years of which was providing Resource support at the middle school level, as well as her education, which includes many continuing education classes, a master's degree in Resource support, and a thesis on working with pupils with language disorders.

22.    Student presented expert testimony that, among other things, Resource support on a push-in basis was not appropriate for Student, and that a SDC with mainstreaming options was the appropriate placement for him. However, the testimony is not entitled to great weight, because: (1) the expert spent little time with Student only the week before the hearing; (2) the expert was not fully aware of all of the assessments District had conducted on Student; (3) the expert did not observe Student at KMS; (4) the expert did not interview any of Student's teachers at KMS; (5) the expert did not know how much time Student spent receiving Resource support, or what methods or materials Ms. Ryan used when providing support to Student, or what accommodations and/or modifications Student was receiving at KMS; and (6) the expert had no knowledge of the KMS SDC. Moreover, the expert's testimony was occasionally contradictory. For example, the expert recommended a SDC for Student, and testified that Student needed good language models, such as typically developing peers; however, the expert also expressed concern about exposing Student to SDC pupils with moderate to severe behavioral problems.

23.    Student points to his mediocre grades as evidence that his KMS GE classroom placement was inappropriate. However, other factors impacted Student's grades. For example, Student only participated in two or three sessions of the KMS Homework Club. When Ms. Ryan called Mother, she was told that Student could attend, so Ms. Ryan did not know why he did not attend. Also, Student is supposed to wear glasses. However, he does not do so at school. During a psycho-educational assessment in September 2003, Student

told an assessor that he does not bring his glasses to school because he believes they cause people to laugh at him.

24.     Student's placement in the GE classroom with Resource support at KMS comported with the last consented-to IEP, dated September 29, 2005. As determined in Factual Findings 18 through 24, the placement was designed to meet Student's unique needs and was reasonably calculated to provide some educational benefit, in conformity with the last IEP for which Mother had provided her consent, except for Student's need for SLT, as noted in Factual Findings 25 through 28. In addition, Student received approximately as much Resource support from Ms. Ryan, on an average daily basis, as he did from Ms. Marsh during the previous school year, without considering the lack of SLT during the 2006-2007 SY, as discussed in Factual Findings 25 through 28. Therefore, except for the lack of SLT, Student's KMS placement (educational program) was appropriate.

*Student's Unique Speech-Language Needs as of the Start of the 2006-2007 SY*

25.     During the 2005-2006 SY, Ms. Marsh, Student's SDC teacher who was also a credentialed speech and language therapist, included SLT in the context of the core curriculum of the Learning Center.

26.     Jean Zika is a licensed speech and language therapist who works for East Bay Therapy, which contracts with the District. Early in the 2006-2007 SY, Ms. Ryan talked to Ms. Zika about Student's unique needs, to help ensure that Ms. Zika's assessment of Student was as thorough as possible regarding Student's language processing skills. Ms. Zika assessed Student in September and October 2006, and recommended that Student receive two 30-minute sessions of individual SLT per week.

27.     As noted above, District concedes that it failed to provide Student with SLT from the start of the 2006-2007 SY until the District was ready to conduct an IEP on November 13, 2006. Student is entitled to compensatory SLT to remedy this denial of a FAPE. If the IEP team meeting had been held as scheduled, Ms. Zika would have recommended that Student receive two 30-minute sessions of individual SLT per week, which Ms. Zika was ready to provide to Student. Therefore, Student is only entitled to compensatory education for approximately 11 weeks from the beginning of the 2006-2007 SY on August 31, 2006, to November 13, 2006.

28.     The only evidence of the appropriate amount of SLT for Student was Ms. Zika's testimony regarding her recommendation of two 30-minute individual sessions per week. Given the extent of Student's speech and language disability, and its effect on Student's academic performance, the appropriate compensatory education is on a two-to-one ratio. Accordingly, Student is entitled to 22 hours of compensatory SLT, to remedy the denial of a FAPE.

*Mother's Requests for a Copy of Student's Educational Records*

29.    Education Code section 56504 establishes the right of a parent to receive a complete copy of a pupil's educational records within five days of making a written request for such records. However, the jurisdiction of OAH is limited to issues related to the proposal or refusal to initiate or change the identification, assessment, or educational placement of a child, or the provision of a FAPE to a child, or the refusal of a parent or guardian to consent to an assessment of a child, or a disagreement between a parent or guardian and the district as to the availability of a program appropriate for a child. (Ed. Code, § 56501, subd. (a).) Accordingly, compliance with the five-day requirement is the proper subject matter of a compliance complaint to the California Department of Education, rather than a request for due process hearing filed with OAH. However, in this matter, Student alleged not only failure to comply with the five-day rule, but also that the District withheld documents and in so doing significantly impeded Mother's opportunity to participate in the decision-making process.

30.    On October 5, 2006, Mother brought a written request for Student's records to the KMS main office, which was promptly brought to the attention of Ms. Ryan. Mother said that the records she was requesting were to provide information to a tutor. Ms. Ryan wrote a note on Mother's request indicating that she was providing to Mother Student's latest IEP and Student's test scores, because that is what she thought would be helpful to the tutor.

31.    While it is obvious that Mother sincerely cares about her son's well-being, for various reasons her testimony was unreliable. Although Mother never informed District personnel prior to the hearing, she has continuing disabilities that affect her memory, and her abilities to tell time and understand words. At times, Mother's disabilities resulted in confusing or contradictory testimony. Mother thought she had first requested Student's records in September 2006, and that she had gone to KMS several times to request Student's records. However, Ms. Ryan only recalled the records request of October 5, 2006. In addition, Mother could not clearly remember what documents District produced to her, or when the District produced documents. For example, Mother believed that the District had initially given her a thin envelope containing some, but not all, of Student's IEPs. However, at another point in her testimony she agreed that, if Student had only three IEPs and an addendum as of Fall 2006, she had been given all of Student's IEPs.

32.    Other factors negatively impacted the credibility of Student's case. Mother's attorney prepared the Complaint, but Mother did not review it before it was filed. The Complaint makes the following allegations, among others: (1) Student was not recommended for ESY after the 2005-2006 SY (p. 4, lines 8-9);[2] (2) Student was "exited" from special education (p. 4, lines 18-19); (3) District failed to present Mother with an

---

[2] Mother testified that the District did not provide ESY for Summer 2005, because she never received the ESY form from the District, even though she contacted the school and Ms. Marsh said that she would send the form home in Student's backpack. However, Mother's testimony in this regard was not credible, because Ms. Marsh established that she taught Student during Summer 2004 and Summer 2005.

assessment plan (p. 5, line 25); and (4) Mother did not consent to the "recent testing" (p. 4, line 22).[3] However, during Mother's testimony at the hearing, she conceded that: (1) each of Student's three IEPs indicated that ESY was recommended; (2) Student was never exited from special education; and (3) District presented an assessment plan to her, which she signed. Accordingly, the Complaint contains at least four demonstrably false allegations.

33.    The District practice was to give parents a copy of the IEP at the conclusion of the IEP team meeting. Ms. Marsh, Student's fourth and fifth grade SDC teacher, attended the 2004 and 2005 IEPs. Mother was given a copy of the IEP at the conclusion of those IEP team meetings.

34.    District concedes that its initial production of Student's educational records to Mother may not have been complete. On October 20, 2006, Mother's attorney wrote District a letter requesting Student's complete educational records. In response, District provided a copy of Student's educational records to Mother's attorney. District supplemented its production of Student's educational records at the mediation on February 1, 2007.

35.    District's production of Student's records to Mother or Mother's attorney, or the lack thereof, did not in any way affect Student's placement. As determined in Factual Findings 13 through 24, District properly placed Student in a KMS GE classroom with Resource support, in the absence of an updated IEP. Nor did District's production of Student's records, or lack thereof, significantly impede Mother's opportunity to participate in the IEP process, because Mother unreasonably refused to participate in the IEP process, choosing instead to refer all District employees to her attorney, who unreasonably refused to participate in the IEP process until the parties had been to mediation. Accordingly, the manner and amount of District's production of Student's records did not constitute a material procedural violation of Student's right to a FAPE.

*Prior Written Notice*

36.    A school district must provide written notice to the parent of a disabled child a reasonable time before the district proposes or refuses to initiate or change the identification, evaluation, or educational placement of provision of a FAPE to the child.

37.    As determined in Factual Findings 3 through 9, the lack of an IEP team meeting during the 2006-2007 SY, with the exception of six weeks of delay, is the result of the unreasonable actions of Mother and Mother's attorney. As a result, the District was not required to provide prior written notice to Mother regarding the failure to hold an IEP.

---

[3] Mother testified that her disabilities prevented her from understanding all of the words in all of the documents. However, Ms. Ryan called Mother before sending home the assessment plan, and explained to Mother the document itself, its purpose, and the fact that she (Ms. Ryan) would be contacting Mother again, for an IEP team meeting, so that the assessment results could be explained and discussed.

38.    As determined in Factual Findings 13 through 17, the movement of Student from a SDC to a GE classroom, within the first week of his first year in middle school, was simply an appropriate correction of a clerical error, which the District was required to make to comply with Student's IEP, rather than a change in placement. Thus, District was not required to send prior written notice to Mother before correcting its error.

39.    As determined in Factual Findings 18 through 24, Student's placement in a KMS GE classroom with Resource support from Ms. Ryan conformed to the placement called for in the IEP dated September 29, 2005, was designed to meet Student's unique needs, and was reasonably calculated to provide some educational benefit. As a result, the District was not required to provide prior written notice to Mother regarding Student's 2006-2007 placement and services before holding an IEP team meeting, the purpose of which would have been to design appropriate placement and services.

## APPLICABLE LAW PRINCIPLES

1.    Student has the burden of proving the essential elements of his special education claims. (*Schaffer v. Weast* (2005) 546 U.S. 49 [126 S.Ct. 528, 163 L.Ed.2d 387].)

2.    A child with a disability has the right to a FAPE. (20 U.S.C. §1412(a)(1)(A);[4] Ed. Code, § 56000.) A FAPE is defined in pertinent part as special education and related services that are provided at public expense and under public supervision and direction, that meet the State's educational standards, and that conform to the student's IEP. (§ 1401(9); Cal. Code Regs., tit. 5, § 3001, subd. (o).) "Special education" is defined in pertinent part as specially designed instruction and related services, at no cost to parents, to meet the unique needs of a child with a disability. (§ 1401(29); Ed. Code, § 56031.) "Related services" or DIS means transportation and other developmental, corrective and supportive services as may be required to assist the child to benefit from special education. (§ 1401(22); Ed. Code, § 56363, subd. (a).) Placement is defined as the "unique combination of facilities, personnel, location or equipment necessary to provide instructional services to an individual with exceptional needs, as specified in the [IEP], in any one or a combination of public, private, home and hospital, or residential settings." (Cal. Code Regs., tit. 5, § 3042.)

3.    There are two parts to the legal analysis in suits brought pursuant to the IDEA. First, the court must determine whether the school system has complied with the procedures set forth in the IDEA. (*Bd. of Ed. of the Hendrick Hudson Sch. Dist v. Rowley* (1982) 458 U.S. 176, 200 [*Rowley*].) Second, the court must assess whether the IEP developed through those procedures was designed to meet the child's unique needs, reasonably calculated to enable the child to receive educational benefit, and comported with the child's IEP. (*Id.* at pp. 206-207.)

---

[4] All statutory references are to the Individuals with Disabilities Education Improvement Act (IDEA), title 20 of the United State Code, unless specifically noted otherwise.

4.    In *Rowley*, the United States Supreme Court recognized the importance of adherence to the procedural requirements of the IDEA. But procedural violations constitute a denial of FAPE only if the violations caused a loss of educational opportunity to the student or significantly infringed on the parents' right to participate in the IEP process. (*Rowley, supra,* 458 U.S. at pp. 206-207; *M.L. v. Federal Way Sch. Dist.* (9th Cir. 2004) 394 F.3d 634, 646; *M.M. v. Sch. Dist. of Greenville County* (4th Cir. 2002) 303 F.3 523, 534; *Amanda J. v. Clark County Sch. Dist.* (9th Cir. 2001) 267 F. 3d 877, 892.)

5.    A school district must conduct reassessments of a pupil receiving special education and related services, and hold IEP team meetings, after the initial assessment that established eligibility. (§ 1414(a)(2)(A); 34 C.F.R. § 300.303(a); Ed. Code, § 56381, subd. (a)(2).) The reassessments and resulting IEP team meetings need not occur more frequently than once a year, but must be done no less than every three years, unless the parent and the public agency agree that reevaluation is unnecessary. (§ 1414(a)(2)(B)(i) and (ii); 34 C.F.R. § 300.303(b); Ed. Code § 56381, subd. (a)(2).)

6.    Parents have a right to review the District's proposed assessment plan before deciding whether to consent to the plan, and the right to receive a copy of the report of any assessment performed on the child. (Ed. Code, §§ 56043, subds. (a) & (b); 56329, subd. (a).) Parents also have the right to examine, and to receive a copy of, "all school records of the child." (Ed. Code, §56504; see also 34 C.F.R. § 300.501(a) ["The parents of a child with a disability must be afforded . . . an opportunity to inspect and review all education records with respect to (1) The identification, evaluation, and educational placement of the child; and (2) The provision of FAPE to the child."].)

7.    Another procedural requirement, found in both State and federal law, requires that the parents of a child with a disability be afforded an opportunity to participate in meetings with respect to the identification, assessment, educational placement and provision of a FAPE to the child. (Ed. Code, §§ 56304, 56342.5; 34 C.F.R. § 300.501(b).) Thus, parents are required members of the IEP team. (§ 1414(d)(1)(B)(i); 34 C.F.R. § 300.321(a) (1); Ed. Code, § 56341, subd. (b)(1).) Education Code section 56341.1 also requires the IEP team to consider, among other matters, the strengths of the pupil and the results of the initial assessment or most recent assessment of the pupil. The IEP team must consider the concerns of the parents throughout the IEP process. (§ 1414(c)(1)(B), (d)(3)(A)(i), (d)(4)(A)(ii)(III); 34 C.F.R. §§ 300.305(a)(i), 300.324(a)(1)(ii), (b)(1)(ii)(C); Ed. Code, § 56341.1, subds. (a)(1), (d)(3), (e).)

8.    Another key aspect of the parents' right to participate in the IEP process is the school district's obligation to provide prior written notice whenever the school district "refuses to initiate or change the . . . educational placement of the child, or the provision of a [FAPE] to the child." (§ 1415(b)(3)(b); 34 C.F.R. § 300.503(a).) The notice is to contain: (1) a description of the action refused by the agency, (2) an explanation for the refusal, along with a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the refusal, (3) a statement that the parents of a disabled child are entitled to procedural safeguards, with the means by which the parents can obtain a copy of those

procedural safeguards, (4) sources of assistance for parents to contact, (5) a description of other options that the IEP team considered, with the reasons those options were rejected, and (6) a description of the factors relevant to the agency's refusal. (§ 1415(c)(1); 34 C.F.R. § 300.503(b).)

9.      As noted in Applicable Law Principle 3, the second prong of the *Rowley* test analyzes substantive appropriateness, specifically, the level of instruction and services that must be provided to a student with disabilities to satisfy the IDEA's requirements. The *Rowley* Court determined that a student's IEP must be designed to meet the student's unique needs, be reasonably calculated to provide the student with some educational benefit, and comport with the student's IEP. (*Rowley, supra,* 458 U.S. at pp. 188-189, 200-201.) To determine whether the District offered Petitioner a FAPE, the analysis must focus on the adequacy of the District's proposed program. (*Gregory K. v. Longview Sch. Dist.* (9th Cir. 1987) 811 F.2d 1307, 1314.)  Liability will only be imposed on a school district for "material" failures to implement an IEP. (*Van Duyn v. Baker School District* (9th Cir. 2007) 481 F.3d 770.)

10.      An IEP need not conform to a parent's wishes in order to be sufficient or appropriate. (*Shaw v. Dist. of Columbia* (D.D.C. 2002) 238 F.Supp.2d 127, 139 [IDEA does not provide for an "education . . . designed according to the parent's desires"], citing *Rowley, supra,* 458 U.S. at p. 207.) Nor does the IDEA require school districts to provide special education students with the best education available or to provide instruction or services that maximize a student's abilities. (*Rowley, supra,* 458 U.S. at pp. 198-200.) Rather, the *Rowley* Court held that school districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instructional and related services which are individually designed to provide educational benefit to the student. (*Id.* at p. 200.) Hence, if the school district's program met the substantive *Rowley* factors, then that district provided a FAPE, even if petitioner's parents preferred another program and even if his parents' preferred program would have resulted in greater educational benefit. (*Gregory K., supra,* 811 F.2d at p. 1314.)

11.      Parents may be entitled to appropriate relief, including reimbursement for the costs of placement or services that they have independently obtained for their child, when the school district has failed to provide a FAPE and the private placement or services are determined to be proper under the IDEA and are reasonably calculated to provide educational benefit to the child. (*School Committee of the Town of Burlington v. Department of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996, 85 L.Ed.2d 385] (*Burlington*); *Student W. v. Puyallup School District* (9th Cir. 1994) 31 F.3d 1489, 1496.) Court decisions subsequent to *Burlington* have also extended relief in the form of compensatory education to students who have been denied a FAPE. (See, e.g., *Todd v. Andrews* (11th Cir. 1991) 933 F.2d 1576; *Lester H. K. Gilhool and the Chester Upland School District* (3d Cir. 1990) 916 F.2d 865; *Miener State of Missouri* (8th Cir. 1986) 800 F.2d 749.) Compensatory education is an equitable remedy. (*Student W., supra,* 31 F.3d at pp. 1496-1497.) There is no obligation to provide day-for-day or hour-for-hour compensation. "Appropriate relief is

relief designed to ensure that the Student is appropriately educated within the meaning of the IDEA." (*Student W., supra,* 31 F.3d at p. 1497.)

## LEGAL CONCLUSIONS

*Issue 1: Did the District deny Student a FAPE by not conducting an annual IEP for Student from September 29, 2006, to the present?*

12.     Based on Factual Findings 1 through 12, and Applicable Law Principles 1 through 5, the District violated Student's right to a FAPE by failing to conduct Student's annual IEP by September 29, 2006, and for the six-week delay until the District initially scheduled Student's IEP team meeting on November 13, 2006. However, based on Factual Findings 1 through 12, District's responsibility for holding an IEP ended on November 13, 2006, based on the unreasonable refusal of Mother and Mother's attorney to participate in the IEP process.

*Issue 2: Did the District deny Student a FAPE from August 31, 2006, through the present by moving Student from a SDC to a GE classroom without Mother's consent?*

13.     Based on Factual Findings 12 through 16, and Applicable Law Principles 1 through 4 and 7, Student's placement in a KMS SDC at the start of the 2006-2007 SY was the result of a District clerical error. Therefore, the District's movement of Student from the SDC to a GE classroom with Resource support did not constitute a change in placement. Rather, District's movement of Student was simply the prompt correction of its clerical error. The District was required to move Student to the GE classroom with Resource support to comply with Student's IEP of September 29, 2005, the IEP in effect at the time, and to provide Student with a FAPE. Accordingly, the District was not required to obtain Mother's consent to move Student.

*Issue 3: Did the District deny Student a FAPE from August 31, 2006, through the present by failing to provide Student with a placement and services designed to meet Student's unique needs and reasonably calculated to provide some educational benefit in conformity with the IEP?*

14.     Based on Factual Findings 13 through 28, and Applicable Law Principles 1 through 3 and 9 through 11, Student's placement in the KMS GE classroom with Resource support complied with the last consented-to IEP, dated September 29, 2005. The placement conformed with that IEP by providing Resource support on both a push-in and a pull-out basis, for approximately the same amount of time as provided for in that IEP. The placement was reasonably calculated to provide some educational benefit, and was designed to meet Student's unique needs in the areas of reading comprehension and math problem solving, due to a significant language impairment or auditory processing disorder, both expressive and receptive, as well as attention issues (focus, organization, and distractability). Therefore, Student's KMS placement was appropriate, except for the lack of SLT.

15.    Based on Factual Findings 17 through 21, and Applicable Law Principles 1 through 4 and 9 through 11, the District violated Student's right to a FAPE by failing to provide SLT from the start of the 2006-2007 SY on August 31, 2006, until November 13, 2006, when it was ready to conduct an IEP team meeting. This constitutes a denial of FAPE to Student for a period of approximately 11 weeks. Student required 1 hour per week of individual SLT. In addition, Student would have made additional academic progress had he received the SLT. Accordingly, District must provide 22 hours of compensatory individual SLT to Student to remedy this violation of Student's right to a FAPE.

*Issue 4: Did the District deny Student a FAPE by not timely producing Student's educational records to Mother, and by not producing Student's completed educational records?*

16.    Based on Factual Findings 28 through 34, and Applicable Law Principles 1 through 4 and 6, District's production of Student's records to Mother or Mother's attorney, or the lack thereof, was not a meaningful procedural violation because it did not in any way affect Student's placement. District properly placed Student in a KMS GE classroom with Resource support, except for the lack of SLT. Nor did the production of Student's records, or lack thereof, significantly impede Mother's opportunity to participate in the decision-making process, because Mother and Mother's attorney unreasonably refused to participate in the IEP process.

*Issue 5: Did the District procedurally deny Student a FAPE by failing to provide Mother with prior written notice regarding the change of Student's placement from a SDC to a GE classroom; failing to hold Student's annual IEP team meeting; and failing to design an educational placement to meet Student's unique needs?*

17.    Based on Factual Findings 13 through 17, and Applicable Law Principles 1 through 4 and 8, District's movement of Student from the KMS SDC to a GE classroom with Resource support was not a change in placement requiring prior written notice.

18.    Based on Factual Findings 1 through 12, and Applicable Law Principles 1 through 4, 7, 8, 10, and 11, because of the unreasonable refusal of Mother and Mother's attorney to participate in the IEP process, the District is only responsible for failing to hold an IEP from September 29, 2006, to November 13, 2006.

19.    Based on Factual Findings 1 through 12 and 23 through 28, and Applicable Law Principles 1 through 4, 7, 8, 10, and 11, as to Student's educational placement, because of the unreasonable refusal of Mother and Mother's attorney to participate in the IEP process, the District is only responsible for failing to provide SLT during the 11 weeks between the beginning of the 2006-2007 SY on August 31, 2006, and November 13, 2006. Both of these violations will be addressed via the award of compensatory individual SLT. The District committed no other meaningful procedural violations of Student's right to a FAPE.

ORDER

1.    Student's claims and proposed resolutions, except as to the District's failure to hold an IEP for six weeks, and to provide SLT for 11 weeks, are denied.

2.    District shall provide 22 hours of compensatory individual SLT to Student.

PREVAILING PARTY

Education Code section 56507, subdivision (d), requires a decision to indicate the extent to which each party prevailed on each issue heard and decided. Student prevailed on portions of Claims 1 and 3. However, District conceded the basis for the two partial claims on which Student prevailed. The District prevailed on Claims 2, 4, and 5, and on the remaining portions of Claims 1 and 3 on which Student partially prevailed.

RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within ninety (90) days of receipt of this decision. (Ed. Code, § 56505, subd. (k).)

Dated:  May 18, 2007

JOHN A. THAWLEY
Administrative Law Judge
Special Education Division
Office of Administrative Hearings

16

**EXHIBIT B**

**LexisNexis®** *Total Research System*

Switch Client ¦ Preferences ¦ Sign Off ¦ ? Help

Search ▼ Research Tasks ▼ Get a Document ▼ *Shepard's®* ▼ Alerts ▼ Total Litigator ▼ Counsel Selector ▼ Dossier ¦ His

Source:  Legal > / . . . / > US District Court Cases, Combined  i
Terms:  name(taylor p. and missouri)  (Edit Search | Suggest Terms for My Search)

✔Select for FOCUS™ or Delivery
☐

2007 U.S. Dist. LEXIS 59570, *

**TAYLOR P.**, by and through her parents, CHRIS P. and CARRIE C., Plaintiffs, v. **MISSOURI** DEPARTMENT OF ELEMENTARY AND SECONDARY EDUCATION and POPLAR BLUFF R-I SCHOOL DISTRICT, Defendants. POPLAR BLUFF R-I SCHOOL DISTRICT, Counterclaim Plaintiff, v. CHRIS P., CARRIE C., NEAL TAKIFF, and JENNIFER HANSEN, Counterclaim Defendants,

Case No. 06-4254-CV-C-NKL

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI, CENTRAL DIVISION

2007 U.S. Dist. LEXIS 59570

August 14, 2007, Decided

**SUBSEQUENT HISTORY:** Motion granted by, Summary judgment granted by, Summary judgment denied by Taylor P. v. Mo. Dep't of Elem. & Secondary Educ., 2007 U.S. Dist. LEXIS 74070 (W.D. Mo., Oct. 3, 2007)

**PRIOR HISTORY:** Taylor P. v. Mo. Dep't of Elem. & Secondary Educ., 2007 U.S. Dist. LEXIS 19771 (W.D. Mo., Mar. 20, 2007)

**CORE TERMS:** attorney's fees, counterclaim, frivolous, prevailing party, fee provision, statute of limitations, retroactivity, retroactively, process hearing, personal jurisdiction, administrative hearing, administrative procedures, exhaustion, new law, matter jurisdiction, requesting, predicate, litigate, matter of law, state law, action to recover, school district, school board, failure to state a claim, award fees, federal cause of action, narrow exception, manifest injustice, administrative remedies, administrative proceeding

**COUNSEL:** [*1] For Taylor P, by and through her parents and legal guardians Chris P. and Carrie C., Plaintiff: Mark P Johnson ✔, LEAD ATTORNEY, Sonnenschein, Nath & Rosenthal, Kansas City, MO.

For MO Department of Elementary & Secondary Education, Defendant:
Sarah E. Ledgerwood ▾, LEAD ATTORNEY, Missouri Attorney General's Office-JC, Jefferson City, MO.

For Poplar Bluff R-I School District, Defendant: Teri B. Goldman, LEAD ATTORNEY, Chesterfield, MO.

For Poplar Bluff R-I School District, Counter Claimant: Teri B. Goldman, Chesterfield, MO.

For Dr. Carrie Carda, Dr. Chris Pinderski, Counter Defendants: Mark P Johnson ▾✔, LEAD

EXHIBIT B

ATTORNEY, Sonnenschein, Nath & Rosenthal, Kansas City, MO.

For Jennifer Hansen, Neal Takiff, Counter Defendants: Gregory P Goheen ▾ ✓, LEAD ATTORNEY, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS.

**JUDGES:** Nanette K. Laughrey ▾, United States District Judge.

**OPINION BY:** Nanette K. Laughrey ▾

 OPINION


**ORDER**

Plaintiffs Chris P. and Carrie C. ("the Parents") bring this action on behalf of their daughter, Taylor P., under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 et seq., to challenge the result of a due process hearing held January 23-27 and March 27-29, 2006. The Poplar Bluff R-I School District **[*2]** ("the District") has counterclaimed for prevailing party attorney's fees against the Parents and their former attorneys ("Takiff and Hansen") under 20 U.S.C. § 1415(i)(3)(B)(i)(II). Pending before the Court is Takiff and Hansen's Motion to Dismiss the Counterclaim [Doc. # 30]. For the reasons set forth below, the Motion to Dismiss is denied.

## I. Background

For the purposes of this Motion to Dismiss, the Court accepts as true the facts alleged in the District's Counterclaim which were referenced in this Court's order denying the Parents' motion to dismiss the counterclaim [Doc. # 28].

In support of their motion to dismiss the counterclaim, Takiff and Hansen have raised four issues in their pleading: 1) personal jurisdiction; 2) subject matter jurisdiction (ripeness); 3) statute of limitations; and 4) failure to state a claim upon which relief can be granted. Additionally, Takiff and Hansen argue that at the time the Parents sought a due process hearing, there was no statutory authority to award attorney fees to a school district even when it was the prevailing party.

## II. Discussion

## A. Retroactivity

The District's claim for attorney's fees is based on the 2004 version of the IDEA. In that year, **[*3]** the IDEA was changed to permit a prevailing local educational agency to recover attorney fees against the attorney of a parent who files a complaint that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continues to litigate after the litigation clearly becomes frivolous, unreasonable, or without foundation. See 20 U.S.C. 1415(i)(3)(B)(i)(II). This provision did not go into effect until July 1, 2005, eight months after the Parents filed their request for a due process hearing.

Takiff and Hansen argue that the 2004 version of the IDEA should not be applied retroactively in this case because the statute doesn't authorize a retroactive application and there is a presumption against retroactivity. The District argues that this case falls within the recognized *Bradley* exception to the presumption against retroactivity and should be applied from the Parents' initial filing in November 2004.

When a case implicates a federal statute enacted after the events in the suit, the Court's first

task is to determine whether Congress has expressly prescribed the statute's proper reach. *See Landgraf v. USI Film Products,* 511 U.S. 244, 280, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994). The text of 2004 **[*4]** amendments to the IDEA do not evince any clear expression of congressional intent. [1] *See Tucker by Tucker v. Calloway County Bd. of Educ.,* 136 F.3d 495, 501 (6th Cir. 1998). When a statute contains no such express provision, the court must determine whether application of the amendment would "increase a party's liability . . . with respect to transactions already completed," and, if so, the traditional presumption is that the amended statute should not control. *See Bowen v. Georgetown University Hosp.,* 488 U.S. 204, 208, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988); *Landgraf,* 511 U.S. at 280.

### FOOTNOTES

[1] The previous Handicapped Children Protection Act provision for attorney's fees for claims raised under the Education of the Handicapped Act (after which the IDEA was modeled) was explicitly retroactive, *see Yaris v. Special School Dist. of St. Louis County,* 661 F.Supp. 996, 998 (E.D. MO, 1987), suggesting that the omission of comparable language in the 2004 act "cannot realistically be attributed to oversight or to unawareness of the retroactivity issue." *See Landgraf,* 511 U.S. at 256. This alone is a strong indication that the new attorney fee provision should not be applied retroactively.

*Bradley* is a narrow exception to the *Bowen* **[*5]** presumption against retroactivity. *See Bradley v. School Bd. of City of Richmond,* 416 U.S. 696, 94 S. Ct. 2006, 40 L. Ed. 2d 476 (1974). In *Bradley,* the Supreme Court retroactively applied a new fee provision allowing prevailing plaintiffs to seek attorney's fees in school desegregation cases. However, this case is distinguishable from *Bradley.*

*Landgraf* makes clear that *Bradley* was only a narrow exception to the *Bowen* presumption. *See Landgraf* 511 U.S. at 277-279. In fact, *Bradley's* directive to apply the law in effect at the time of decision explicitly includes the caveat that it does not apply where "doing so would result in manifest injustice." *Bradley,* 416 U.S. at 711. *Landgraf* points out that there was no injustice in the narrow *Bradley* situation for two reasons--both of which distinguish this case.

First, imposition of the one-way fee provision against the school board in *Bradley* did not alter the Board's previously existing "constitutional responsibility for providing pupils with a nondiscriminatory education." *Bradley,* 416 U.S. at 721. In other words, because the board already had a constitutional responsibility to act in a certain way, the new fee provision alone could not be a legitimate reason for the board **[*6]** to change its "predicate actions" respecting the students. This case is different. Here, the new portion of the fee provision operates against parents and their lawyers. Parents and their lawyers have no previous, overriding constitutional obligation to refrain from requesting an administrative hearing; therefore, a fee provision could legitimately affect that predicate behavior.

Secondly, in applying the new fee provision, the *Bradley* court saw no manifest injustice "in light of the prior availability of a fee award and the likelihood that fees would be assessed under pre-existing theories." *Bradley,* 416 U.S. at 721. The court concluded that "the new fee statute simply did not impose an additional or unforeseeable obligation upon the school board." *Id.* The District has identified no pre-existing theories under which complaining parents or their attorneys could be held liable for prevailing-party attorney's fees. Therefore, this amendment does impose an unforeseeable obligation upon plaintiffs requesting a hearing and it would be manifestly unjust to retroactively apply the attorney fee shifting provision of the 2004 IDEA under these circumstances.

The District alternatively claims that **[*7]** the fee provision should be applied "at least as of

December 30, 2005" (Counterclaim, p. 23 Ore. 47, 31 P 62) because that was when Takiff and Hansen filed a new statement of issues to be decided during the administrative hearing-- replacing the Parents' initial, more general filing from a year earlier. When Takiff and Hansen filed the revised statement, the July 5, 2005 amendments to the IDEA were already in effect. The District in oral argument asserted that amending the issues allowed the Parents and their lawyers an opportunity to re-evaluate their claim under the demands of the new law and therefore the new law imposed no unforeseen obligations. Consequently, the District argues that a "frivolous action" was effectively initiated after the new law was in place, and the new provision for attorney's fees should apply from Dec. 30 onward.

This argument would be persuasive, but the administrative panel decided that the Dec., 2005 statement of issues was not actually an amendment at all. *See* Due Process Decision at 2 n.1. Rather, the panel decided that issues 1, 2, and 4 were only a "more specific listing of what was expressed in the original due process request and not additional issues." *Id.* And **[*8]** the panel dismissed issue 3 as a matter of law without hearing evidence related to it. *Id.* Therefore, the Dec. 2005 statement of issues did not restart the action and cannot serve as the predicate act of "filing" a frivolous complaint which the IDEA proscribes. *See* 20 U.S.C. 1415(i)(3)(B)(i)(II).

Finally, although the 2004 IDEA cannot be applied retroactively to the date of the initial filing of the complaint, and Takiff and Hansen's restatement of the issues can not be considered "initiating" a frivolous lawsuit after the 2004 IDEA was in effect, the Court cannot say that the District is unable to prove that under any circumstances Takiff and Hansen continued to litigate after the effective date of the statue what had become a frivolous or unreasonable claim. Counterclaim, p. 23 Ore. 47, 31 P 62(b); *see Fernandez-Vargas v. Gonzales,* 126 S.Ct. 2422, 2432, 165 L. Ed. 2d 323 (2006). Therefore, the Court will not dismiss the counterclaim based on Takiff and Hansen's retroactivity argument.

## B. Personal Jurisdiction

Takiff and Hansen allege that this Court does not have personal jurisdiction over them because the District did not have leave of this Court to join them as defendants to the counterclaim against the Parents. **[*9]** However, no such leave of court is required. Rule 13 (h) states: "Persons other than those made parties to the original action may be made parties to a counterclaim . . . in accordance with the provisions of Rules 19 and 20." Joining a party under Rule 20 does not require leave of court as Takiff and Hansen suggest; rather, the filing of the counterclaim itself joined Takiff and Hansen to the action as counterclaim defendants.

In addition, Takiff and Hansen argue that they have not been properly served pursuant to Rule 4. However, the personal service of Mar. 30, 2007 is adequate under Rule 4; and it was effected within the time frame permitted by this Court. *See* Fed. R. Civ. P 4; *See* Doc. # 28. Therefore, this Court has personal jurisdiction over Takiff and Hansen as they have been properly joined and served.

## C. Subject Matter Jurisdiction

### 1. Ripeness

Takiff and Hansen assert that this court does not have subject matter jurisdiction over the counterclaim because an action to recover attorney's fees under 20 U.S.C. § 1415(i)(3)(B) is generally not considered ripe until the administrative proceeding is finally decided, including all appeals. However, the District is already the prevailing **[*10]** party at the administrative hearing. The Eighth Circuit has held that a plaintiff is a "prevailing party" if he obtains "actual relief on the merits of his claim [that] materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."

*Birmingham v. Omaha School Dist.*, 298 F.3d 731, 734 (8th Cir. 2002) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111-12, 113, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)). Similarly, it is logical to assume that a defendant is a prevailing party for purposes of the IDEA fee provision if, after "any action or proceeding," he is not required to provide any relief or benefit to the plaintiff. *See* 20 U.S.C. § 1415(i)(3)(B). Therefore, at least for purposes of the Motion to Dismiss, the District is a prevailing party within the meaning of the IDEA because it was not required to modify its behavior in any way. *See Due Process Decision* at 59.

The fact that the Parents have sought judicial review of the administrative decision does not make the attorney's fee claim unripe. *See Poole v. Rourke*, 779 F.Supp 1546 (E.D. Cal. 1991). As noted by the Poole Court, the party seeking fees "is not required to wait until all post-judgment **[*11]** appeals have been exhausted to collect his fee." *Id.; see also Animal Lovers Volunteer Ass'n v. Carlucci*, 867 F.2d 1224, 1225 (9th Cir. 1989)

Therefore, the District's counterclaim is ripe. The logistical issues that Takiff and Hansen raise may be resolved simply by delaying action on the request for attorney's fees until after the merits of the appeal have been adjudicated. These logistical concerns, however, do not deprive the Court of jurisdiction.

## 2. Exhaustion of Administrative Remedies

Takiff and Hansen further allege that this Court cannot have subject matter jurisdiction until the District has exhausted all administrative remedies. However, a party is not required to exhaust administrative procedures and remedies where doing so would be futile or where the administrative agency would be unable to provide adequate relief. *See Monahan v. State of Neb.*, 645 F.2d 592, 597 (8th Cir. 1981); *Blackmon v. Springfield R-XII School Dist.*, 198 F.3d 648, 656 (8th Cir. 1999); *See W. B. v. Matula*, 67 F.3d 484, 496 (3rd Cir. 1995) (holding that the IDEA does not require exhaustion where the relief sought is unavailable in an administrative proceeding).

In this case, the administrative panel explicitly **[*12]** found, and this court agrees, that the IDEA does not authorize administrative panels to award attorney's fees. [2] *See Due Process Decision* at 2 n.2. Under the plain language of the IDEA, only "the court" is authorized to award fees. Therefore, it would be futile to require further administrative exhaustion under the facts of this case.

### FOOTNOTES

[2] Although it was not required, the District did request attorney's fees from the panel and that request was denied. *See Due Process Decision* at 2 n.2.

Furthermore, even if the administrative panel were authorized to award fees under the IDEA, Attorney's fee inquiries largely present questions of law which do not require administrative agency expertise. *See Vultaggio ex rel. Vultaggio v. Board of Educ., Smithtown Central School Dist.*, 216 F.Supp. 2d 96, 103 (E.D.N.Y. 2002). Consequently, there is no reason to require administrative exhaustion.

## C. Statute of Limitations

Takiff and Hansen argue that the appropriate statute of limitations for requesting attorney's fees in this case is 30 days, as provided in the Missouri Administrative Procedures Act. However, Missouri law does not control these proceedings. Rather, this action is procedurally governed directly **[*13]** by the text of the IDEA. *See* 20 U.S.C. § 1415(i)(2)(A); *See Due Process Decision* at 59.

The IDEA itself does not include a time limitation for seeking attorney's fees. When Congress does not provide a statute of limitations for a federal cause of action, a court should "borrow" the most analogous state law. *See Lampf, Pleva, Lipkind. Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 355, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991); *See Aaron v Brown Group, Inc.*, 80 F.3d 1220, 1223 (8th Cir. 1996).

The 30-day limitation provided in the Missouri Administrative Procedures Act (MAPA) is not an analogous state law because the District's counterclaim is a federal cause of action entirely separate from the administrative hearing. Indeed, the administrative panel in an IDEA case does not have the power to award attorney's fees. Therefore, seeking prevailing party fees under the IDEA is not analogous to the administrative process.

Furthermore, the MAPA 30-day limit does not apply because the Eighth Circuit has recognized that prevailing parties may claim attorney's fees by motion pursuant to Rule 54(d)(2) at the conclusion of an appeal under 1415(i)(2). *See Birmingham v Omaha Sch. Dist.*, 298 F.3d 731, 733 (8th Cir. 2002) (noting that **[*14]** the parents' attorney filed a motion for attorney fees upon remand after an appeal of the district court's decision in an IDEA action). Since a prevailing party can file for attorney's fees even at the conclusion of an appeal, Congress could not have intended a limit as short as thirty days for seeking attorney's fees from administrative procedures.

Rather, the state statute of limitations most analogous to the District's counterclaim is the general limitation on statutory liability found in Mo. Ann. Stat. § 516.120.2, imposing a five-year limitation for "an action upon [any] liability created by a statute other than a penalty or forfeiture." *See Zipperer By and Through Zipperer v. School Bd. of Seminole County, Fla.*, 111 F.3d 847, 851 (11th Cir. 1997) (sound policy suggests allowing more time for filing an action for attorney's fees under the IDEA than for filing a substantive appeal of the administrative decision); *see e.g., Robert D. v. Sobel*, 688 F.Supp. 861, 864 (S.D.N.Y. 1988) (borrowing the three-year statute of limitations for actions to recover upon a liability imposed by statute). Therefore, for purposes of this case, the Court adopts a five year statute of limitations for **[*15]** the District's claim for attorney fees.

## D. The District's Counterclaim Does Not Fail to State a Claim upon Which Relief Can Be Granted

A counterclaim should not be dismissed for failure to state a claim unless it "appears beyond doubt that the [counterclaimant] can prove no set of facts to warrant a grant of relief." *Knieriem v. Group Health Plan, Inc.*, 434 F.3d 1058, 1060 (8th Cir. 2006). The IDEA allows the District to seek attorney's fees from the "attorney of a parent who continue[s] to litigate after the litigation clearly became frivolous, unreasonable, or without foundation." 20 U.S.C. 1415(i)(3)(B)(ii). Takiff and Hansen argue that because the hearing panel voted 2-1 against them on some points, their litigation was not frivolous as a matter of law. They offer no legal support for this assertion. Additionally, they contend that no facts are presented or alleged which could possibly warrant an award of fees in this case. However, the District's Counterclaim alleges that Takiff and Hansen ignored repeated warnings from the District's lawyers that the District viewed the complaint as frivolous because the Parents had failed to comply with IDEA's requirements for alternative placement. **[*16]** Furthermore, after the due process hearing, the three person panel appointed by the Department of Education noted in its decision that the District committed no procedural errors in not reevaluating Taylor over the summer of 2004 after her father told Williams of her hearing loss, and that any inadequacy of Taylor's IEP at the beginning of the 2004-05 school year was caused by the Parents' failure to notify the District of Taylor's hearing loss and the need for reevaluation. Finally, the panel noted that the Parents' failure to give advance notice to the District of their intent to transfer Taylor to Moog "deprived the District from the ability to develop an alternative IEP," and precluded reimbursement.

At this early stage in the litigation, the Court cannot say that the District will be unable to prove any set of facts demonstrating that the litigation ever became frivolous, unreasonable, or without foundation. This fact-intensive inquiry is more properly resolved at summary judgment. The Motion to Dismiss the Counterclaim against Takiff and Hansen is therefore denied.

## III. Conclusion

Accordingly, it is hereby

ORDERED that Plaintiffs' Motion to Dismiss the Counterclaim [Doc. # 30] is **[*17]** DENIED.

s/ Nanette K. Laughrey

United States District Judge

Dated: August 14, 2007

Jefferson City, Missouri

Source: Legal > / . . . / > **US District Court Cases, Combined** 
Terms: **name(taylor p. and missouri)** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Friday, December 21, 2007 - 8:32 PM EST

* Signal Legend:
⬤ - Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

**LexisNexis**®     About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.